Argued and submitted September 7, reversed November 22, 1983

STATE OF OREGON,
*Petitioner on review,*

*v.*

FLOYD EMMIT EBY, JR.,
*Respondent on review.*

(No. 81-1035, CA A24088, SC 29706)

673 P2d 522

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for petitioner on review. With him on the petition and brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

John Daugirda, Deputy Public Defender, Salem, argued the cause for respondent on review. With him on the brief was Gary D. Babcock, Public Defender, Salem.

JONES, J.

**JONES, J.**

The state petitions this court to reverse the decision of the Court of Appeals which reversed the defendant's conviction for felony murder and first degree robbery and remanded for a new trial.

The defendant was accused of shooting and killing Ted Schleining, owner of the Clackamas Auto Wreckers, during a robbery occurring on March 29, 1980. The trial commenced in the Circuit Court of Clackamas County in January, 1982, after the effective date of the Oregon Evidence Code.[1]

The defendant argued to the Court of Appeals that the trial court erred in allowing the state to "vouch" for the credibility of two witnesses, Nancy McVae and Paul Bigornia, who testified for the state regarding defendant's involvement in the killing.

Nancy McVae, with whom the defendant was then living, testified that the defendant, Floyd Eby, proposed a plan to her to rob the victim because the victim was known to carry large sums of money on his person. The defendant and McVae drove to the victim's wrecking yard. At 8 p.m. they followed the victim as he was leaving work. Ms. McVae described the robbery and killing as follows:

"* * * Floyd [Eby] grabbed the gun out of the back seat. He went up to Mr. Schleining and he, Ted, goes, 'Well, what's going on here? What's going on?' And Floyd replied, 'Well, you're being robbed. And I don't want no shit about it. You're being robbed, give me your money.'

"And this guy says, 'Well, I ain't going to let no punk kid rob me.' And Floyd, pointing the gun at him like this. And this guy was walking up to him and trying to grab the gun at the same time. Well, Floyd told him to stop. And he kept coming. And Floyd shot him.

"And then the guy's laying there on the ground. And he is flopping around and he is kicking at Floyd and trying to get

---

[1] "This Act shall take effect on January 1, 1982. The Oregon Evidence Code shall apply to actions, cases and proceedings commenced after the effective date of this Act. The Oregon Evidence Code also shall apply to further procedure in actions, cases and proceedings then pending except to the extent that application would not be feasible or would work injustice, in which event former evidential principles shall apply." OEC Art XI, § 101.

Floyd away from him. And Floyd saying, 'Give me your money, give me your money.' And then the guy handed him some money.

"And this guy was crying, he was holding his shoulder, he was holding his wallet. And he pulled a little bit of of money out of his pocket and gave it to Floyd.

"And Floyd kept kicking him and saying, 'This isn't all of it, I'll shoot you again if you don't give me it.' Ted Schleining kept kicking him back. They were just kicking each other. And Schleining kept crying and screaming for help."

She further testified that defendant stole $240 from the victim and when she and defendant returned home a friend, David Cox, called and the defendant said he "thought he killed a guy tonight." Cox advised the defendant to get rid of the gun, which was unique and easily traceable.[2] In response to this suggestion, McVae stated that the defendant called Paul Bigornia, told him he had shot someone, and asked Bigornia to take the rifle, file the firing pin and to keep the weapon.

After this, McVae testified to questions put to her by the prosecutor as follows:

"Q. And you were given a form of immunity, weren't you?

"A. Yes.

"Q. It was promised you would not be prosecuted if you gave truthful testimony, isn't that correct?

"A. Yes.

"Q. A promise was made to you, though, wasn't it?

"A. Yes.

"Q. You would have to testify truthfully and not have been involved in the actual killing itself?

"A. I couldn't have a gun, I couldn't have got out of the car, and I couldn't have shot Ted Schleining.

"Q. Did you do any of those things?

"A. No.

"Q. But you were in the car, weren't you?

"A. Yes.

---

[2] Defense counsel admitted in closing argument that the murder weapon belonged to the defendant.

"Q. Now, after October 22nd the investigation was proceeding, wasn't it?

"A. Yes.

"Q. And you testified before the Grand Jury?

"A. Yes.

"* * * * *

"Q. How do you feel testifying in court?

"A. I'm a little nervous but I feel like it's time to face my problems and get them out. I'm sick of running from them. So I would rather just deal with them, get it out. If I'm going to be prosecuted, then that is what I have coming.

"Q. Are you going to be prosecuted for your involvement in the Schleining case?

"A. Not in the Ted Schleining case."

Defendant claims that the trial court erred in allowing the state to vouch for her credibility by introducing the conditions of the immunity agreement in which McVae agreed to testify truthfully.

■ The defendant made no objection of any kind to any of this testimony by McVae. An appellate court has no obligation to consider a claim that evidence was erroneously received in the absence of objection thereto, *State v. Abel,* 241 Or 465, 467, 406 P2d 902 (1965), although the court may do so in the case of "errors of law apparent on the face of the record" under ORAP 7.19(5).[3]

After Nancy McVae testified, but before Paul Bigornia was called as a witness for the state, the prosecutor put on the following testimony from Deputy District Attorney Fred Lenzer before the jury and without objection by the defense:

"Q. Mr. Lenzer, what do you do for a living?

"A. I'm a Deputy District Attorney for Multnomah County.

---

[3] ORAP 7.19(5) provides:

"Alleged errors will not be considered on appeal unless preserved in the lower court and assigned as error in the appellant's or cross-appellant's opening brief, except that the appellate court may take notice of errors of law apparent on the face of the record. * * *"

"Q. How long have you been a Deputy District Attorney?

"A. Approximately four and a half years?

"Q. Who's your boss?

"A. Michael D. Schrunk.

"* * * * *

"Q. Now, did you ever come in contact with a fellow by the name of Paul Bigornia?

"A. Personally I did not come in contact with him, no.

"* * * * *

"Q. Did you request a grant of immunity for Paul Bigornia?

"A. Yes, I did.

"Q. For what kind of crime did you request immunity?

"A. I requested immunity for any crime related to the disposition of what I was advised was a murder weapon.

"Q. And what crime is committed when one disposes of a murder weapon?

"A. That would be a hindering prosecution.

"Q. What does hindering prosecution mean?

"A. Hindering prosecution, that is the name of a crime. It is a Class C felony.

"* * * * *

"Q. When you gave immunity to Paul Bigornia, did you give him immunity for murder?

"A. No.

"Q. Did you give him immunity for robbery?

"A. No.

"Q. What did you give him immunity for?

"A. As I've indicated, the immunity was given for any act that he was involved in in disposing of the murder weapon which would amount to hindering prosecution or conspiracy to hinder prosecution."

At this point of the trial, the following question was asked by the prosecutor and the following objection made by the defense:

"Q. Now, did you require certain conditions of Mr. Bigornia before this agreement ---

"[DEFENSE COUNSEL]: Your Honor, I'm going to object to this, it's not relevant. I would like an in camera hearing on this."

Thereupon the jury retired from the courtroom and the following proceedings occurred:

"THE COURT: Do you think immunity to Bigornia is not relevant?

"[DEFENSE COUNSEL]: Well, the conditions aren't, Your Honor, I don't think are relevant to this immunity.

"THE COURT: He asked him whether or not he was present when Bigornia was given immunity, as I understand the question. Is that right, Mr. [prosecutor]?

"[PROSECUTOR]: No, Your Honor. My question was were conditions imposed, calling for a yes or a no answer. I might note to the Court I have instructed Mr. Lenzer and he is, of course, agreeable, he will make no mention of any polygraph findings of truthfulness that we requested and required of Bigornia. I expect him to answer the question yes and to answer the conditions were several. Some of them were that he testify truthfully and fully at hearings, that he not have participated in the commission of the homicide, that it would not cover false swearing and perjury.

"THE COURT: Now, you had no objection when Nancy McVae disclosed the conditions of her immunity.

"[DEFENSE COUNSEL]: Well, Your Honor, that's right. But I have a condition here or I have an objection here because I don't think the condition that he testify truthfully, that its probative value is — it doesn't have any probative value and it's prejudicial.

"THE COURT: You mean you're saying that you have no objection to the conditions as long as they don't mention that he testify truthfully?

"[DEFENSE COUNSEL]: And that they don't — that and the polygraph is the one that I would object to. Also — I don't have any mention on here about false swearing or perjury as being excluded.

"THE COURT: The objection will be overruled. You may disclose the conditions.

Bring the jury back. Except for those items that you have mentioned."

Thereupon the jury was returned to the courtroom, after which the following proceedings were had:

"Q. [BY DEFENSE COUNSEL]: Were any conditions imposed on Mr. Bigornia with respect to this grant of immunity?

"A. [BY FREDERICK LENZER, Deputy District Attorney] Yes.

"Q. What does that mean, conditions being imposed?

"A. Conditions mean there were certain conditions that were set out that had to be met in order for the grant of immunity to be given."

Thereupon State's Exhibit Number 185 was marked for identification.

"Q. Does State's 185 memorialize some of the conditions of the immunity grant?

"A. That's correct.

"Q. Is that in your — made under your direction and involve your signature and the signature of Michael Schrunk?

"A. Correct. This is the memorandum that I had drafted to Mr. Schrunk. It has my initials on it and has his initials on it as well.

"Q. Now, how many — were there several conditions imposed?

"A. Yes.

"Q. Remembering our admonition previously, but could you tell us about some of the conditions?

"A. All right. The conditions were that Mr. Bigornia testify truthfully and completely at all hearings regarding the homicide. And further that he himself had not participated in the planning or the commission of the homicide itself.

"Q. Now, in exchange for that he wouldn't be prosecuted for hindering prosecution, is that correct?

"A. That's correct."

The question presented by the defendant on appeal was:

"Did the state improperly vouch for the credibility of [this witness] by indicating [the witness] had promised to testify truthfully as a condition of [the] immunity agreement?"

First, the claim that the state "vouched" for the credibility of these witnesses has no merit.[4] When the

---

[4] The claim that the state "vouched for" the credibility of its witnesses is an unfortunate choice of words. The language calls to mind the now discredited "voucher rule," a doctrine which had been used to justify restrictions against impeaching one's own witness. The intertwined concepts of the voucher rule and the prohibition on impeaching one's own witness have been subject to great criticism by prominent legal authorities for years. The court stated in *Johnson v. Baltimore & O.R. Co.*, 208 F2d 633, 635 (3rd Cir 1953):

"Then there is the further question whether, when one calls a witness, everything which that witness says, so far as the party calling him is concerned, must be taken as gospel truth. * * * When witnesses were called by a party from among his friends to act as compurgators it was completely rational that the party calling them would have to stand by what they said. After all he chose his friends. But when witnesses are called, in some stranger's lawsuit, to tell about things they saw, heard, or did, there is no reason in logic or common sense or fairness why the party who calls them should have to vouch for everything they say. All this has been said vigorously and strikingly by Dean Wigmore, who stated: 'There is no substantial reason for preserving this rule,—the remnant of a primitive notion.' It is only necessary to cite Wigmore for full discussion of the matter. [3 Wigmore on Evidence 383, 389 (3d ed. 1940).]

"All the modern writers in the law of evidence speak to the same effect. Thus, Edmund M. Morgan * * * says:

'The fact is that the general prohibition, if it ever had any basis in reason, has no place in any rational system of investigation in modern society. And all attempts to modify it or qualify it so as to reach sensible results serve only to demonstrate its irrationality and to increase the uncertainties of litigation.'

"John M. Maguire also has attacked the rule:

'According to the best professional thought, sweeping prohibition of impeachment by a party of his own witnesses is nonsense—most regretably not simple nonsense, but very complex nonsense. * * *' [Maguire, Evidence— Common Sense and Common Law 43 (1947).]

"Likewise, see John E. Tracy: 'The reasons given for this rule * * * are none of them very sound.' [Tracy, Handbook of the Law of Evidence 193 (1952).] In an exhaustive article, Mason Ladd advocates 'complete abolition of the rule' and proposes as a statutory substitute: 'No party shall be precluded from impeaching a witness because the witness is his own.' [Ladd, Impeachment of One's Own Witness—New Developments, 4 U. of Chi.L.Rev. 69, 96 (1936).] Finally, the Model Code of Evidence framed by the American Law Institute abolishes the prohibition: '* * * for the purpose of impairing or supporting the credibility of a witness, any party including the party calling him may examine him and introduce extrinsic evidence concerning any conduct by him and any other matter relevant upon the issue of his credibility as a witness. * * *' [Model Code of Evidence, Rule 106 (1942).]" (Text of footnotes parenthetically added.) *Id.* at 635.

Any remaining remnants of any supposed rule that a party "vouches" for his own witness and therefore cannot impeach that witness died with the adoption of OEC 607, which provides:

"The credibility of a witness may be attacked by any party, including the party calling the witness."

defendant chose the word "vouch," we believe the defendant meant that testimony about the witnesses agreeing to testify truthfully constituted an improper attempt to bolster the witnesses' credibility. The defense never objected to the fact of the immunity agreement, but only to its condition that the witness agreed with the prosecutor to testify truthfully.[5] The

---

The commentary to this rule set out the wisdom behind the rule as follows:

> "At common law, a party was prohibited from impeaching its own witness. This policy was based on the doctrine that a party vouches for the credibility of its witnesses, and the assumption that a party can wrongly coerce its witnesses if allowed to impeach them. These are false premises.
>
>> "* * * [A] party does not vouch for [the party's] witnesses because, except for expert and character witnesses, * * * witnesses are not chosen but [are] those persons who happen to be present and see the event which is the basis of the case. The second policy concerned with the situation where a party's witness decides to change [the witness's] story [and] testify unfavorably * * * falsely assumes that whenever a witness changes * * * testimony, it will be from falsehood to truth, that the party coerces the witnesses by threatening impeachment, and that the truth is thereby suppressed. Certainly witnesses could be changing their testimony from truth to falsehood and so the coercion, if there is any, could be supporting, not suppressing, the truth.' Montana Rules of Evidence, Rule 607, Comment at 44 (1977).

"Accord, *Chambers v. Mississippi*, 410 US 284, 296 n 8, 935 S Ct 1038, 35 L Ed 2d 297 (1973), acknowledging criticism of the voucher rule as 'archaic, irrational, and potentially destructive of the truth-gathering process' and indicating that application of the rule in criminal cases may raise constitutional problems. See also, cases collected in 3 Wigmore, *Evidence* section 905 (3d ed 1940)." Commentary, OEC 607, 118-19.

[5] The prosecution in a criminal case does not have the luxury to pick only upstanding, law-abiding witnesses to present the state's case to the jury. Many key prosecution witnesses are crime partners, ex-convicts, drug addicts and the like. Both prosecution witnesses McVae and Bigornia presented serious credibility problems for the prosecution. McVae, by her own testimony, helped plan and carry out the robbery and Bigornia hindered prosecution by admitting in court that he altered the weapon after the killing. The state, in bringing out the fact that these two culpable witnesses had been granted immunity, was attempting to take the sting out of their obvious bias and interest in saving themselves from prosecution.

In *State v. Estlick*, 269 Or 75, 78, 523 P2d 1029 (1974), the court said that there is no rule in this state which prohibits the state from trying to take the "sting" out of evidence of a witness's bias and interest by bringing it out itself rather than waiting for the defendant to bring it out on cross-examination. The court found no vice in this advocacy practice.

In *State v. Gilbert*, 282 Or 309, 577 P2d 939 (1978), the issue was whether a party could bring out on direct examination the fact that his own witness had been convicted of a crime. Justice Linde, writing for the court, said:

> "Of course, defendant in this case was not seeking to dispute, disparage, or deny [the witness's] testimony or induce the jury to disbelieve it. To the contrary, he wanted the jury to credit what [the witness] said, and to do so after having [the witness] introduced to them for who he was, without the 'surprise' revelation, on

objection to this condition was that "it doesn't have any probative value and it's prejudicial." The defendant is correct that this condition to the immunity agreement is not relevant; however, its admission was not prejudicial. As we shall demonstrate, its admission does not justify reversal of these convictions.

We are asked to set aside felony murder and robbery convictions of the defendant resulting from a prolonged jury trial (the transcript of the trial consumed 2,581 pages), because it was brought out that one prosecution witness, who later took an oath to testify truthfully in front of that jury, had made an agreement with the prosecution to testify truthfully. It must be remembered that all this happened after a more culpable prosecution witness had previously testified to exactly the same condition of a similar immunity agreement before the same jury without objection.

In a recent federal case, *United States v. Henderson,* 717 F2d 135, 136-37 (4th Cir 1983), the United States Court of Appeals analyzed exactly the same problem with which we are confronted here:

> "[The defendant] was convicted by a jury of bank robbery, bank larceny and assault with a deadly weapon while committing the robbery * * *.

> "On appeal, [defendant] contend[ed] that the government improperly bolstered the testimony of its main witness, prior to any challenge to the witness's credibility, by putting before the jury on direct examination the contents of the witness's plea bargain, which included a promise to give truthful testimony. * * *

> "* * * * *

> "* * * The government's case against [the defendant] rested in part on the testimony of Lanard Pegeus, allegedly another one of the robbers, who had reached a plea agreement with the government. Pegeus's plea bargain included a condition that he 'fully and truthfully respond to all questions'

---

cross-examination, that this witness presented to them without disclosure by defendant turns out 'really' to be a sometime narcotics offender. Such an objective is not to impeach one's own witness. It is difficult to perceive any prejudice to the opposing party merely because it is deprived of the opportunity to produce the same revelation. * * *" *Id.* at 313.

concerning bank robberies, put by federal officials before grand juries or at trials.

"During the government's direct examination of Pegeus, the prosecutor began to question Pegeus concerning the plea bargain. When the prosecutor asked 'What are your obligations under the agreement?,' defense counsel interrupted. At a bench conference, defense counsel objected to the government reading from or introducing the plea agreement letter, stating that 'there are aspects of that letter that are just self-serving, and seem to bolster the witness before he is impeached, or there is any question as to his credibility.' The attorney further explained that his objection was to the language in the letter concerning Pegeus's promise 'to give truthful testimony.' The judge overruled the objection and the prosecutor proceeded to elicit from Pegeus the terms of the agreement, including the promise of truthfulness.

"* * * * *

"Testimony concerning the existence of a plea or immunity agreement concerning a government witness can cut both ways. On the one hand, as in *Hoover v. Maryland,* 714 F2d 301 (4th Cir. 1983), the agreement's existence or terms may undermine the witness's credibility by showing that the witness's devotion to the truth may be threatened by the great personal gains to be secured by testifying in the manner desired by the government. On the other hand, the agreement may aid the government by indicating the witness's knowledge of the crime or by improperly suggesting 'that the prosecutor is forcing the truth from his witness and [thereby conveying] the unspoken message . . . that the prosecutor knows what the truth is and is assuring its revelation.' *United States v. Roberts,* 613 F.2d 530, 536 (9th Cir. 1980), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981)." (Brackets in original.)

The court concluded:

"In the present case, there is no evidence that the government derived any improper advantage from Pegeus's testimony concerning his promise to be truthful. The prosecutor's questions do not imply that the government had special knowledge of Pegeus's veracity. * * *

"We conclude therefore that the district court did not abuse its discretion in permitting the government to introduce the terms of Pegeus's plea bargain during the government's case in chief." *Id.* at 138.

■ We disagree that such a ruling is discretionary as set forth in *Henderson.* Instead, we believe that the preferable rule is simply to regard such evidence as not relevant since it does not tend to prove or disprove credibility.

■ The Court of Appeals went off course in reversing these convictions because of a perceived violation of OEC 609-1(3). OEC 609-1(3) has no application to this case. It provides:

> "Evidence to support or rehabilitate a witness whose credibility has been attacked by evidence of bias or interest shall be limited to evidence showing a lack of bias or interest."

OEC 609-1(3) is a rule unique to Oregon and not found in the Federal Rules of Evidence. It was adopted by the legislature at the urging of the Oregon Evidence Commission for the purposes set forth in the commentary:

> "Evidence of the truthfulness of the witness cannot be shown regardless of whether evidence of bias or interest is introduced. See ORE 608(1)(b). Under this subsection, evidence that is used to rehabilitate a witness must address itself to the nature of the impeaching evidence, i.e., it must only show lack of bias or interest. *Sheppard v. Yocum and DeLashmutt,* 10 Or 402 (1881); *State v. Estlick,* supra." OEC 609-1(3), Commentary, 130.[6]

---

[6] *State v. Estlick,* 269 Or 75, 78, 523 P2d 1029 (1974), had nothing to do with an immunity agreement conditioned on a witness agreeing to testify truthfully. In *Estlick,* the state's witness was allowed to testify on direct examination, over objection, to the following:

> "* * * (1) that he was on 'work release" with his parole date approaching and a state correctional officer loaned Smith $25; (2) that an investigator for an insurance company threatened Smith that if he did not testify, additional charges would be brought against him, and also against his wife, but that the insurance investigator would 'go to bat' for him if he testified; and (3) that the state's attorney had said, nevertheless, that he would not be involved in any threats or promises and had offered no such inducements; and (4) that the state's attorney had told Smith that if he testified the state's attorney would notify the parole board of his testimony." *State v. Estlick,* 269 Or at 76-77.

As to the receipt of the "rehabilitating" aspects of this testimony, the court in *Estlick* said:

> "Testimony that the district attorney never made any threats or promises to the witness is rehabilitative, tending to show no interest. Ordinarily, receipt of such evidence before the introduction of any impeaching testimony showing interest would be error. For example, *Sheppard v. Yocum and DeLashmutt,* 10 Or 402, 413-419 (1881-1882). In the present case, however, the receipt of such evidence is not error because it came in as a minor incident to the admission of testimony showing bias and interest which, as we here hold, was admissible." *Id.* at 81.

Although we agree with the commentary to OEC 609-1, we note the commentary to the Oregon Evidence Code is not "official," an attribution given to it by the Court of Appeals in this case. The commentary was never adopted by the legislature.

"* * * The Commentary is not an official part of the code and was not approved by the entire legislature. Nonetheless, it provides highly useful background regarding each rule and guidance to courts and attorneys in interpreting the new rules." Kirkpatrick, Oregon Evidence, p xiv (1982).

The statement in the commentary to OEC 609-1(3): "Evidence of the truthfulness of the witness cannot be shown regardless of whether evidence of bias or interest is introduced," refers to the type of testimony offered in *Sheppard v. Yocum and DeLashmutt,* 10 Or 402 (1881). Under OEC 608(1)(b), this type of evidence is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation or otherwise. No such evidence in either opinion or reputation form was offered by the state in this case under OEC 608(1).[7] No witness testified to the effect that "in my opinion the state's witness is a truthful person," or "I know the reputation of the state's witness in the community and his reputation in the community for truth and veracity is good." Such evidence would not be admissible under OEC

---

In the case at bar, the alleged rehabilitating aspect of the testimony—to testify truthfully—followed the evidence about the grant of immunity to a culpable witness.

The other case mentioned in the OEC 609-1(3) commentary and cited in *Estlick, Sheppard v. Yocum and DeLashmutt,* 10 Or 402, 413-19 (1881), dates back over 100 years. In *Sheppard,* two witnesses were called by the plaintiff and testified to certain matters material to the issue. They were then impeached with prior inconsistent statements. The plaintiff, in rebuttal, was allowed to introduce evidence to prove that the general reputation of the witnesses for truth and veracity was good. Justice Lord, writing for the court, concluded such rehabilitation was improper. Obviously, this case has no application here.

[7] OEC 608(1) provides:

"The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but:

"(a) The evidence may refer only to character for truthfulness or untruthfulness; and

"(b) Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

609-1 because it does not show lack of interest or bias. The only rehabilitative evidence admissible under OEC 609-1(3) is evidence to show lack of bias or interest. Evidence of the agreement to testify truthfully neither violates OEC 609-1(3) nor conforms to it. As previously stated, evidence of such a condition to an immunity agreement simply is not relevant.

■■     The condition of a plea agreement that the witness will testify truthfully does not tend to prove a witness's credibility. It should have been excluded on relevancy grounds. However, in this case we find that no prejudice resulted from its admission. One witness had already testified to an identical condition in her plea agreement without objection. Disclosure of this irrelevant condition as to the state's second witness was not so prejudical as to require reversal.

Because the Court of Appeals reversed and remanded this case, it did not address defendant's second claim that the mention of a polygraph by a state's witness warrants a mistrial. During the course of his direct examination of state's witness Bigornia, the prosecutor inquired about the witness's prior knowledge of how the victim died. Noting that Bigornia had some reports with him, the district attorney asked what they were. "Oh. This was my interview with Detective Shaffer and it also contains the polygraph —," Bigornia responded. The prosecutor, obviously not expecting the mention of a polygraph, immediately cut off the witness and restricted him to his interview with Detective Shaffer. Shortly thereafter, defendant moved for a mistrial, which the trial court denied. The court reasoned that:

> "* * * [A]pparently there was a polygraph involved with someone and I don't know who, and that's why I don't think that it appears * * * who took the polygraph and/or what the results were."

■     There was no evidence this witness "passed a polygraph." This case is clearly distinguishable from *State v. Middleton,* 295 Or 485, 668 P2d 371 (1983). In *Middleton,* the fact that the witness took and passed a polygraph was admitted. We held the admission of such evidence to be improper. Here, Bigornia's reference to the word "polygraph," without more, was so indefinite as to render any prejudicial effect

speculative at best. The trial court did not abuse its discretion in denying the motion for mistrial.

The evidence that the state's witnesses agreed to testify truthfully was not relevant. Because we are confident that the error in admitting this evidence was harmless, we are not required to reverse defendant's conviction. Or Const, Art VII, § 3; ORS 138.230. The trial court's denial of the motion for mistrial was proper.

■■ The defendant did not raise the issue of the propriety of the imposition of a 10-year mandatory minimum sentence. Under ORAP 7.19(5),[8] we take notice of the issue and, pursuant to *State v. Macy,* 295 Or 738, 671 P2d 92 (1983), that portion of defendant's sentence which imposes a 10-year mandatory minimum is vacated.

The Court of Appeals is reversed.

---

[8] *See* n 3, *ante.*