Argued and submitted November 9, 1995, judgment reversed in part; otherwise affirmed, and case remanded to the circuit court for further proceedings March 21, reconsideration denied April 30, 1996

## STATE OF OREGON,
*Respondent,*

*v.*

## GRANT STEVEN CHARBONEAU,
*Appellant.*

## (CC C9208-34751; SC S41060)

913 P2d 308

David E. Groom, Deputy Public Defender, Salem, argued the cause for appellant. With him on the briefs was Sally L. Avera, Public Defender.

Robert B. Rocklin, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

GRABER, J.

## GRABER, J.

A jury convicted defendant of one count of aggravated murder, six counts of murder, one count of felony murder, two counts of kidnapping in the first degree, one count of kidnapping in the second degree, one count of assault in the third degree, and one count of abuse of a corpse in the second degree. All the crimes related to a single victim.

After the jury answered in the affirmative the penalty-phase questions submitted to it in accordance with ORS 163.150(1)(b),[1] the trial court merged the aggravated murder count with the murder counts and sentenced defendant to death as provided in ORS 163.150(1)(f).[2] The court sentenced defendant to separate terms of imprisonment on each of the other counts and ordered that those sentences run consecutively.

This case comes to us on automatic and direct review under ORS 163.150(1)(g). Defendant seeks reversal of his convictions or, in the alternative, asks us to vacate the death sentence. For the following reasons, we reverse his convictions pertaining to the murder counts and affirm as to the remaining counts.

## I. SUMMARY OF FACTS

■ We view the evidence adduced at trial in the light most favorable to the state, because the jury found defendant

---

[1] ORS 163.150(1)(b) provides:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

[2] ORS 163.150(1)(f) provides:

"If the jury returns an affirmative finding on each issue considered under paragraph (b) of this subsection, the trial judge shall sentence the defendant to death."

guilty. *See State v. Tucker*, 315 Or 321, 325, 845 P2d 904 (1993) (stating principle). The victim, Misty Largo, was a homeless teenager who had been living in Portland for 6 to 12 months at the time of her death. On July 25, 1992, defendant, along with Greg Wilson and two other men, drove to an area under the Marquam Bridge where Largo then was living. Defendant and Wilson were concerned that Largo was spreading rumors about Wilson's having stabbed someone.

The group found Largo and escorted her back to their vehicle at knife-point. They drove to defendant's house. Defendant took Largo into the house, also at knife-point. Many people were there. Largo was taken into a back room. Wilson instructed several of the people present to hit Largo in the face, and they did. Largo was kept in the back room, where she was repeatedly interrogated and slapped.

The next day, defendant and Wilson left the house and told others in the house to make sure that Largo did not leave. When defendant and Wilson returned later that day, Largo was interrogated and slapped for several hours. Then she was taken again to the back room. At some point that evening, Wilson, in defendant's presence, decided that he would kill Largo.

Largo was tied to a wheelchair. Wilson and defendant first tried to kill Largo by poisoning her with a glass of water in which they had dissolved a nitroglycerin pill. When that act failed to kill Largo, defendant found a plastic bag and placed it over Largo's head. After about five minutes, Largo was still breathing. Defendant then located a piece of speaker wire and wrapped it around Largo's neck. Defendant and Wilson took turns choking Largo with the speaker wire for five to ten minutes. Still not convinced that Largo was dead, Wilson hit Largo on the sternum and throat. She "gurgled and choked and stopped breathing."

After Largo died, defendant said that he would dispose of her body. Defendant and Michael Leon Stanton, another man at defendant's house, left with the body. Defendant later said that he had hit Largo twice in the head with a splitting maul and that he and Stanton had stabbed her in the heart.

## II. ADMISSIBILITY OF PLEA AGREEMENT

Defendant assigns as error the admission of portions of a plea agreement between a state's witness, Marvin Al Tai-Juan Smith, and the state.

During the guilt phase of the trial, Smith testified in the state's case-in-chief. On direct examination, Smith testified that he was one of the people who found Largo under the Marquam Bridge on July 25, 1992, and forced her back to defendant's house. Smith was one of the two people responsible for making sure that Largo did not leave the house the next day. Smith saw Largo being beaten and interrogated. He watched defendant and Wilson kill Largo; he held her legs down while defendant and Wilson strangled her. When defendant and Wilson went to dispose of Largo's body, Smith remained at the house to clean it up in an effort to remove traces of the crime. Smith also testified that he was arrested for his participation in the murder of Largo and that he had entered a plea agreement with the state in exchange for his testimony at defendant's trial.

Defense counsel cross-examined Smith about the plea agreement to demonstrate Smith's motive to testify favorably for the state. Smith testified that, originally, he was charged with three counts of aggravated murder, three counts of felony murder, two counts of kidnapping in the first degree, and one count of kidnapping in the second degree. In exchange for his testimony at defendant's trial, Smith testified, he pleaded guilty to one count of felony murder for which the state would recommend a sentence of no more than 121 months in prison.

On redirect examination, the state offered Smith's plea agreement as evidence. The state's purpose was to rehabilitate Smith by showing that he had a motive to testify truthfully; the plea agreement provided that, if he did not, the agreement would be "null and void."

Defendant objected to the admission of the following emphasized portions of that plea agreement (among others):

*"The primary reason for this agreement is that, based on Smith's statements and on its investigation, the State*

*believes this charge accurately reflects the role Smith played in the death of Misty Largo.*

"* * * * *

"Smith's representation that Misty Largo's death was primarily accomplished by other persons is a basic premise for this agreement. *Although the state has reason to believe this is true*, if that premise is demonstrated to be incorrect, this agreement is null and void and shall have no effect except that any statements by Smith pursuant to this agreement and any evidence derived from them shall be admissible in court." (Emphasis added.)

Defendant's lawyer asserted, among other things, that those portions were inadmissible because they stated

"what the State's belief is about it. It's like me sending some statement to the jury about what my belief is.

"* * * * *

"These are * * * statements * * * on the part of the state to bolster [Smith's] testimony[.]

"* * * * *

"I mean, they can put a whole bunch of things in there about we believe he's telling us the truth and he's sworn under a stack of Bibles, it's irrelevant. * * * I don't think this can be used to rehabilitate him or argue for his truthfulness.

"It's merely a recitation of what the State believes.

"* * * * *

"We're objecting on the grounds that it's * * * a comment on Mr. Smith's truthfulness. We feel that it's a showing by the State that they believe in his truthfulness which * * * is not at issue, what the State believes."

The trial court overruled defendant's objections to the foregoing paragraphs, on the ground that the plea agreement was relevant and that any unfair prejudice was outweighed by probative value. The trial court observed:

"It used to be, of course, that a party vouched for the credibility of their witnesses. That's an archaic thing. That's been taken out. But I don't think that in itself makes

it inadmissible, the fact that the State believes in its witnesses."

The trial court redacted the words "honestly" and "truthfully," in a paragraph stating that Smith "agrees to testify fully, honestly, truthfully, and completely" at defendant's trial, and then admitted the agreement. Defendant assigns error to the overruling of his objections.

■ The trial court was correct when it observed that the old rule concerning a party's vouching for the credibility of its witnesses has been rejected. *See State v. Eby*, 296 Or 63, 71 n 4, 673 P2d 522 (1983) (discussing the development and rejection of the "now discredited 'voucher rule' "). The "voucher rule" was the name given to "a doctrine which had been used to justify restrictions against impeaching one's own witness." *Ibid.* In *Eby*, the court held that "[a]ny remaining remnants of [the "voucher rule"] died with the adoption of OEC 607, which provides: 'The credibility of a witness may be attacked by any party, including the party calling the witness.' " *Ibid.*

That rule, however, is not the theory that defendant raised in his objections to the trial court. In this case, defendant objected to the state's attempts to *bolster* Smith's *credibility* by offering the challenged portions of the plea agreement. This court confronted a somewhat similar situation in *Eby* and concluded that such evidence was inadmissible.

In *Eby*, the defendant was convicted of felony murder and first degree robbery. At the defendant's trial, a witness, McVae, testified that the defendant had proposed a plan to her to rob the victim. McVae also testified as to the details of the robbery and the murder. 296 Or at 65-66. After that testimony, the following exchange occurred:

" '[Prosecutor:] It was promised you would not be prosecuted if you gave truthful testimony, isn't that correct?

" '[McVae:] Yes.

" '\* \* \* \* \*

" '[Prosecutor:] You would have to testify truthfully and not have been involved in the actual killing itself?

" '[McVae:] I couldn't have a gun, I couldn't have got out of the car, and I couldn't have shot [the victim].

" '[Prosecutor:]     Did you do any of those things?

" '[McVae:]     No.' "

*Id.* at 66. The defendant did not object to that testimony.

After McVae testified, the prosecutor offered testimony from a Deputy District Attorney, Lenzer. *Id.* at 67. Lenzer had arranged for a limited grant of immunity for another witness, Bigornia. *Id.* at 68. Bigornia had helped the defendant to conceal the murder weapon after the crime had been committed. Over the defendant's objection, Lenzer testified that, in exchange for that grant of immunity, Bigornia agreed to "testify truthfully and completely at all hearings regarding the homicide." *Id.* at 70.

The defendant argued that Lenzer's testimony about the foregoing condition in the immunity agreement — that the witness would testify truthfully — was improper. This court agreed and held that admission of the agreement was not relevant:

> "The condition of a plea agreement that the witness will testify truthfully does not tend to prove a witness's credibility. It should have been excluded on relevancy grounds." *Id.* at 77.

In *Eby*, the court held that the error in that case was not prejudicial. *Ibid.* McVae also had testified concerning an identical provision in her immunity agreement, and the defendant had not objected. Accordingly, the only pertinent alleged error in *Eby* was whether "[d]isclosure of the irrelevant condition as to the state's *second* witness [Bigornia] was * * * so prejudicial as to require reversal." *Ibid.* It was not, because of the fact that Lenzer's testimony concerning the immunity agreement with Bigornia "happened after a more culpable prosecution witness had previously testified to exactly the same condition of a similar immunity agreement before the same jury without objection." *Id.* at 73.

As *Eby* suggests, there are limits to the ways in which a party may bolster the credibility of its witnesses. Three other lines of cases sound similar themes and are relevant to our analysis today.

In *State v. Snider*, 296 Or 168, 674 P2d 585 (1983), the defendant was convicted of felony murder. One of his codefendants, Walker, had entered into a plea agreement with the state that provided, in part, that Walker "will take a polygraph examination as to the truthfulness of his statement to the police and as to his testimony at trial." 296 Or at 170. If the polygraph results demonstrated that Walker had testified truthfully, he would be permitted to plead to a lesser-included offense of manslaughter in the first degree. *Id.* at 170-71.

Walker testified at the defendant's trial. On cross-examination, he was questioned about his plea agreement. On redirect, the state introduced the plea agreement. *Id.* at 171. This court held that introduction of that plea agreement constituted "improper bolstering of [Walker's] credibility" and was reversible error. *Id.* at 173.

The specific holding in *Snider* was limited to the inadmissibility of a term in the witness's plea agreement concerning a polygraph examination. In that regard, *Snider* is factually distinguishable from the present case. However, the underlying concerns that the court expressed in *Snider* about the effects of impermissible bolstering apply more generally:

> "The vice of such evidence is that a jury might give special credence to the testimony of the state's witness because of the binding force of the plea bargain, implying a guarantee of the witness's veracity." *Id.* at 172.

That same kind of concern is the basis for this court's rule, recently restated in *State v. Keller*, 315 Or 273, 285, 844 P2d 195 (1993), that "a witness may not testify about the credibility of another witness." *See also State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983) (*Middleton I*) ("[w]e expressly hold that in Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth"); *State v. Odoms*, 313 Or 76, 82, 829 P2d 690 (1992) (the *Middleton I* rule precludes testimony by one trial witness about whether another trial witness is telling the truth). In *Keller*, the defendant was convicted of sexual abuse in the first degree. One of the state's witnesses was a medical doctor who had extensive experience in treating young victims of sexual abuse. 315 Or at 286. The doctor testified, on

direct examination, that the child was credible. *Id.* at 285. This court held that the trial court erred by admitting that testimony and that the error was prejudicial. *Id.* at 285-86. The doctor had invaded the jury's role as the sole judge of the credibility of another witness. *Id.* at 286.

The rule stated in *Keller* and *Middleton I* is not applicable directly to the facts in this case. In this case, no trial witness gave an opinion as to Smith's credibility. Nonetheless, what happened here through the plea agreement is analogous. The state could not have called the investigating detective to testify: "Based on Smith's statements and on my investigation, I believe that the charge of felony murder accurately reflects the role Smith played in the crime. Moreover, I believe Smith's representation that Largo's death was primarily accomplished by others."

Finally, this court has said that a lawyer may not assert the lawyer's personal opinion as to the credibility of a witness at trial. *See State v. Parker*, 235 Or 366, 377-78, 384 P2d 986 (1963) ("[i]t is improper for counsel to * * * comment * * * upon the credibility of his witnesses"), *reversed on other grounds* 385 US 363, 87 S Ct 468, 17 L Ed 2d 420 (1966).[3] Again, that rule is not applicable directly to this case. In this case, the prosecutor did not argue to the jury: "I believe Smith; so should you." Nonetheless, admission of the challenged portions of the plea agreement in this case allowed the state to do something similar: the statements of belief in Smith's veracity appeared in a document signed by two assistant district attorneys.

It is, of course, true that parties often bolster the credibility of their witnesses indirectly and implicitly through the presentation of corroborating evidence. In *Middleton I*, this court recognized that the presentation of evidence that indirectly and implicitly bolsters the credibility of a witness is permissible.

---

[3] That rule has been incorporated into the Code of Professional Responsibility. DR 7-106(C)(4) provides in part: "In appearing in the lawyer's professional capacity before a tribunal, a lawyer shall not: * * * [a]ssert the lawyer's personal opinion * * * as to the credibility of a witness."

"It is true that if the jurors believed the [witnesses'] testimony, they would be more likely to believe the victim's account. Neither of the [witnesses] directly expressed an opinion on the truth of the victim's testimony. Much * * * testimony will tend to show that another witness either is or is not telling the truth. This, by itself, will not render evidence inadmissible." 294 Or at 435 (citation omitted).

Moreover, when a lawyer presents a witness and argues to the jury that it should find facts in accordance with that witness's testimony, the jury may infer that the lawyer believes the witness. That circumstance, which usually is present, also is permissible.

■ From the three lines of cases just discussed, as well as from this court's decision in *Eby*, the following principle emerges. A witness's testimony or an exhibit may not, explicitly and directly, contain an opinion as to a trial witness's credibility.[4] That principle was violated in this case.

Our holding today is limited to the inadmissibility of the portions of the plea agreement containing the state's opinion that it finds Smith to be credible. Nothing in this opinion should be read to suggest that other portions of a plea agreement are necessarily inadmissible. Nor should this opinion be read to suggest that a witness may not be rehabilitated by asking about the substantive terms of a plea agreement, including a provision that the agreement is void if the witness commits perjury.

---

[4] Opinion evidence is, of course, admissible in accordance with OEC 608, which provides:

"(1) The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but:

"(a) The evidence may refer only to character for truthfulness or untruthfulness; and

"(b) Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

"(2) Specific instances of the conduct of a witness, for the purpose of attacking or supporting the credibility of the witness, other than conviction of crime as provided in [OEC 609], may not be proved by extrinsic evidence. Further, such specific instances of conduct may not, even if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness."

The state argues that admission of the challenged portions of the plea agreement was proper in this case, because they were "introduced to rehabilitate Smith only after defense counsel attacked his credibility. That, the state was entitled to do." In general, of course, the state is entitled to rehabilitate its witness after that witness has been impeached on cross-examination. That right, however, is not unlimited.

In *Snider*, which is discussed above, 323 Or at 46, the state introduced the challenged portions of Walker's plea agreement on redirect examination, only after the defendant had impeached Walker's testimony by cross-examining him about that agreement. 296 Or at 171. Even though the state did so for the purpose of rehabilitating the witness, the court held that introduction of those portions of the plea agreement was erroneous. *Ibid.*; *see also State v. Middleton*, 295 Or 485, 491, 668 P2d 371 (1983) (*Middleton II*) (rejecting the argument that the state "had the right on redirect examination to offer the remainder of the plea agreement in an attempt to rehabilitate the witness" who had been impeached on cross-examination). This case is factually indistinguishable from *Snider* on this point.

The state also argues that, under OEC 106, it was entitled to introduce the entire plea agreement in response to defendant's cross-examination. OEC 106 provides in part:

"When part of * * * [a] writing is given in evidence by one party, the whole on the same subject, *where otherwise admissible*, may at that time be inquired into by the other." (Emphasis added.)

The portions of the agreement to which defendant objected were not "otherwise admissible" as that phrase is used in OEC 106. In *Middleton II*, this court explicitly rejected the argument that the state's impermissible bolstering of its own witness was "otherwise admissible" under a "general rule of evidence" that, if the defendant is entitled to introduce into evidence part of a writing, the state is entitled to introduce the remainder of that writing. 295 Or at 490-91 & n 4. The reasoning of *Middleton II* disposes of the state's argument in that regard.[5]

---

[5] *Middleton II* was tried before the Oregon Evidence Code became effective. Accordingly, this court's interpretation in *Middleton II* of the "general rule of

■　　　In summary, we conclude that the trial court erred when it permitted the state to introduce the above-emphasized parts of Smith's plea agreement. In *Snider*, this court held that the improper bolstering that occurred in that case was prejudicial error:

> "In this case, the testimony of [the witness] provided critical evidence about the alleged conspiracy to kidnap and kill the victim. The error in allowing improper bolstering of this witness's credibility was prejudicial." 296 Or at 173.

*See also Keller*, 315 Or at 286 (holding that a trial witness's testimony as to the credibility of another witness was prejudicial error). In this case, Smith was the *only* witness who testified to the details of defendant's personal participation in Largo's murder. He thus provided the crucial evidence that tied defendant to the commission of the murder. In the circumstances, the error was prejudicial with respect to defendant's convictions of aggravated murder, murder, and felony murder. Those convictions must be reversed.

However, the error concerning the improper admission of parts of the plea agreement between Smith and the state was harmless as to defendant's convictions for two counts of kidnapping in the first degree and one count each of kidnapping in the second degree, assault in the third degree, and abuse of a corpse. *Numerous* witnesses *other than Smith* testified to defendant's involvement in those other crimes. The evidence concerning defendant's guilt of those crimes is extensive and compelling, and it does not depend on Smith's credibility. We conclude that there is little likelihood that the erroneous admission of part of Smith's plea agreement with the state affected the verdict as to defendant's convictions for kidnapping, assault, and abuse of a corpse. *See State v. Pinnell*, 319 Or 438, 446 n 9, 877 P2d 635 (1994) ("[u]nder state law, an error is harmless if there is 'little likelihood that the

evidence" — if one party offers as evidence portions of a writing, the other party is entitled to offer the entire writing — is not directly controlling. However, the court's conclusion in *Middleton II* was based on *Myers v. Cessna Aircraft*, 275 Or 501, 553 P2d 355 (1976). 295 Or at 491. The legislature intended to adopt the rule in *Myers* when it placed the phrase "where otherwise admissible" in OEC 106. *See* OEC 106 Commentary (1981) (stating that OEC 106 "reflect[s] the actual case-law interpretation." OEC 106 allows the "introduction of the remainder of a writing or event, * * * but only * * * if the remaining evidence is otherwise admissible. See * * * Myers[, above] (remainder excluded as hearsay.)").

error affected the verdict'"). We also conclude, beyond a reasonable doubt, that the erroneous admission of part of Smith's plea agreement did not contribute to those convictions. *See Chapman v. California,* 386 US 18, 24, 87 S Ct 824, 17 L Ed 2d 705 (1967) (stating that federal constitutional error is deemed harmless if the appellate court concludes beyond a reasonable doubt that the error did not contribute to the conviction).

## III.  MOTION TO SUPPRESS STATEMENTS

Before trial, defendant moved to suppress statements that he made to the police, implicating him in the crimes for which he was tried. The trial court ruled that those statements were admissible, and defendant has assigned error to that ruling. Because the admissibility of those statements is almost certain to be an issue on remand, we consider this assignment of error now.

The evidence, viewed in the light most favorable to the state, reveals the following facts. A day or two after the Largo murder, Stanton (who had helped defendant to dispose of Largo's body) was killed by James Nelson. Defendant had told Nelson that if Nelson did not kill Stanton, defendant would kill Nelson. Defendant, Nelson, and a third person disposed of Stanton's body.

At that time, defendant also was a "person of interest" to the police concerning the murder of his father, Hal Charboneau.

In the summer of 1992, when police detectives began investigating the murders of Largo, Stanton, and Hal Charboneau, those homicides were not thought to be related, so separate detectives were assigned to investigate each case. Detective Robert Norman was assigned to investigate the Largo murder; Detective Larry Findling was assigned to investigate the Stanton murder; and Detective Judith Brumfield was assigned to investigate the Charboneau murder.

Defendant was taken into custody as a suspect in the murders of Largo and Stanton on August 10, 1992. At that time, defendant was aware that he was under investigation

for the Charboneau murder. Defendant had retained a lawyer, Robert McGee, to represent him in relation to the Charboneau murder. McGee had advised Findling (and, apparently, Brumfield) not to speak with defendant concerning the Charboneau investigation unless McGee were present. Neither Findling nor Brumfield told Norman that McGee had made that request. Norman, however, was aware that McGee was representing defendant concerning crimes other than those involving Largo.

On the day when defendant was taken into police custody for the Largo murder, the following events occurred. At about 3 p.m., defendant was placed in a holding cell. At about 9 p.m., Norman took defendant from the holding cell so that defendant could use the bathroom. During that trip, defendant and Norman stopped at a drinking fountain. Defendant asked Norman, "Will I have an opportunity to call an attorney tonight?" Norman responded, "Yes, you will, if you choose to do that." Defendant nodded his head, but did not say anything audible. Norman then escorted defendant back to the holding cell. Norman told defendant that he was in the middle of an interview and that he would "get back" to defendant as soon as that interview was over.

Norman concluded that defendant's question about "an opportunity to call an attorney tonight" was "an unclear statement * * * as to what his desires were." Accordingly, about 40 minutes later, Norman and Detective Hefley went to the holding cell so that they could clarify the meaning of defendant's statement.

Norman and Hefley told defendant of their investigation of the murders of Largo and Stanton and also told him that they had information linking him to those crimes. Norman and Hefley told defendant that they wished to pursue that information against him and that he "needed to choose what he wanted to do." Norman then asked defendant, "What do you want to do? Do you want to call or what? What option do you want to complete with regard to that?" Defendant replied that he was willing to answer the detectives' questions.

Norman and Hefley then took defendant to an interview room and administered *Miranda* warnings. Defendant

said that he understood his rights and signed a form so stating. Defendant then made statements to the detectives that implicated him in the murder of Largo.

Before trial, defendant moved to suppress the statements that he made to Detectives Norman and Hefley. The trial court denied the motion. Those statements were admitted at trial. Defendant argues that the trial court erred, because admission of those statements violated his right against self-incrimination and his right to counsel. For the reasons that follow, we conclude that the trial court did not err.

■ Defendant's right to be free from compelled self-incrimination arises under Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution.[6] Defendant's right to counsel arises under Article I, section 11, of the Oregon Constitution, and the Sixth Amendment to the United States Constitution.[7] This court considers state constitutional claims before it considers federal constitutional claims. *State v. Esplin*, 314 Or 296, 300, 839 P2d 211 (1992).

A. *State Constitutional Claims*

1. *Article I, section 12, of the Oregon Constitution*

---

[6] Article I, section 12, of the Oregon Constitution, provides in part:

"No person shall be * * * compelled in any criminal prosecution to testify against himself."

The Fifth Amendment to the United States Constitution provides in part:

"No person * * * shall be compelled in any criminal case to be a witness against himself."

The Fifth Amendment privilege against self-incrimination is made·applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Malloy v. Hogan*, 378 US 1, 8, 84 S Ct 1489, 12 L Ed 2d 653 (1964).

[7] Article I, section 11, of the Oregon Constitution, provides in part:

"In all criminal prosecutions, the accused shall have the right * * * to be heard by * * * counsel."

The Sixth Amendment to the United States Constitution provides in part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

The Sixth Amendment right to counsel is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Gideon v. Wainwright*, 372 US 335, 342-45, 83 S Ct 792, 9 L Ed 2d 799 (1963).

■ Defendant argues that, when he asked Norman whether he would "have an opportunity to call an attorney tonight," he unequivocally invoked his right to a lawyer. Therefore, he reasons, any further questioning by the detectives violated his Article I, section 12, rights, and all information gathered from that questioning must be suppressed.

This court has held that, when a suspect is in police custody and makes an unequivocal request to speak to a lawyer, all police interrogation of that suspect must cease. *State v. Montez*, 309 Or 564, 572, 789 P2d 1352 (1990) ("[w]hen a suspect in custody unequivocally requests to talk to a lawyer, that request must be granted and further questioning must cease"); *State v. Isom*, 306 Or 587, 595, 761 P2d 524 (1988) (upon request for counsel, questioning must cease unless the defendant's requests to remain silent and to have the assistance of a lawyer were equivocal); *State v. Kell*, 303 Or 89, 96-99, 734 P2d 334 (1987) (discussing when "the right to consult counsel is waived"). However, this court also has stated that, when a suspect's statement to an officer concerning counsel is equivocal or ambiguous, the officer may ask the suspect further questions "seeking clarification of [the suspect's] intent." *Montez*, 309 Or at 572.

For example, in *Montez*, the defendant argued that a police officer violated his right to counsel by continuing to question him after he had asserted his right to counsel. *Id.* at 571. The police officer interviewed the defendant after the defendant had been read his *Miranda* rights and after the defendant had waived those rights knowingly and voluntarily. *Id.* at 567-68. After the officer began the interview, the defendant stated: "I think I need a lawyer to talk about the rest, so I don't get linked up." *Id.* at 568. The officer next asked the defendant if "he was telling us that he wanted an attorney and did not want to talk with us anymore." The defendant's response was "no." *Ibid.* The officer again advised the defendant of his right to a lawyer. The defendant replied that "that was not what he wanted." *Ibid.* The officer asked the defendant if he was "still willing to talk with us?" The defendant responded, "I will talk to you without [a lawyer]." *Ibid.* The defendant then made statements implicating himself in the crimes for which he had been arrested. *Id.* at 569.

In *Montez*, this court affirmed the trial court's denial of the defendant's motion to suppress the incriminating statements. *Id.* at 573. This court noted that the defendant's inculpatory statements were freely and voluntarily made, that the defendant's remarks regarding a lawyer were "equivocal," and that the officers' subsequent questions were "a reasonable inquiry [into] whether or not [the defendant] wanted an attorney." *Id.* at 572 (internal quotation marks omitted). Specifically, the court stated that the officers' "neutral questions, intended only to clarify whether and to what extent [the] defendant was invoking his right to counsel, did not probe beyond that limited and permissible inquiry." *Id.* at 572-73.

In this case, the trial court found that defendant knowingly and voluntarily waived his *Miranda* rights before he was interviewed by Norman and Hefley. Defendant does not contest that finding. Rather, defendant argues that his question, "Will I have an opportunity to call an attorney tonight?," was an unequivocal request for a lawyer that served to preclude absolutely any further police interrogation. We disagree.

In the totality of the circumstances, defendant's question simply does not constitute, as a matter of law, an unequivocal request for a lawyer. For example: (1) Defendant did not say that he wished to speak with a lawyer at the time; rather, he asked about the future. (2) Even regarding the future, defendant's statement did not say that he necessarily would want to speak with a lawyer; he asked only if he would have an *opportunity* to speak with a lawyer later. Although no single characteristic is controlling, defendant's statement, when considered in its entirety, readily suggests that he was *not* invoking his right to speak to a lawyer at that time but might do so later. The trial court permissibly concluded that defendant's statement was, at most, an equivocal request and that the detectives' efforts to clarify defendant's wishes fell within the permissible range.

Assuming, then, that defendant's statement constituted an equivocal request for a lawyer (as distinct from no request at all), the detectives' subsequent questions of defendant on that point were "intended only to clarify whether and

to what extent defendant was invoking his right to counsel, [and] did not probe beyond that limited and permissible inquiry." *See Montez*, 309 Or at 572-73 (stating quoted criteria). After defendant made his statement, Norman asked defendant a series of neutral questions to determine whether defendant wanted to speak with a lawyer. Those questions were directed only to whether defendant intended to invoke his right to counsel. Defendant said that he did not wish to do so at that time. Defendant was not interviewed by the detectives about the crimes for which he had been arrested until after he so stated. In the circumstances, his responses in the interview were not subject to suppression under defendant's first theory.

■     Defendant separately argues that the detectives' questioning concerning the Largo murder violated his right to be free from compelled self-incrimination because, before that questioning, lawyer McGee had invoked defendant's right to remain silent. Defendant reasons: "Defendant was already represented by an attorney on other charges, and that attorney invoked defendant's right to silence as to all cases that the police were investigating against defendant." Defendant bases that argument on this court's decision in *State v. Simonsen*, 319 Or 510, 878 P2d 409 (1994). Defendant's reliance on *Simonsen* is misplaced.

In *Simonsen*, this court held that the defendant's incriminating statements to police were inadmissible, because they were obtained after the defendant's lawyer had demanded that all questioning of the defendant cease until the lawyer could consult with him. 319 Or at 512. The court described the "law that applies under the circumstances" as follows:

> "Defendant was in custody and charged with a *specific crime* when the interrogation in question commenced. *A specific lawyer had invoked defendant's right to remain silent until after a consultation had taken place*. Defendant had a right to have that invocation by his lawyer of his right to remain silent honored, at least until he was able to consult with the lawyer, or, in the alternative, he waived his right to such a consultation after being fully appraised of the situation that actually existed." *Id.* at 514 (emphasis added).

The court then held that it would impute the knowledge possessed by the police agency to the interrogating officers:

"We hold that a lawyer's request to a responsible officer of a police organization that any questioning of the lawyer's client cease must be honored promptly by that organization, whether or not one or more members of the organization individually are ignorant of the fact or nature of the request." *Id.* at 517.

Defendant argues that, under the rule announced in *Simonsen*, the detectives never should have initiated questioning him about the Largo murder, because lawyer McGee had invoked defendant's right to counsel for the Charboneau investigation. This court's holding in *Simonsen* does not stretch that far. The case stands for the proposition that a lawyer's invocation of a defendant's right to remain silent concerning a "specific crime," for which the defendant's lawyer represented the defendant, foreclosed questioning about that specific crime. *Id.* at 514. Nothing in *Simonsen* suggests that, when a lawyer invokes a defendant's right to counsel for one crime with respect to which that lawyer represents the defendant, the lawyer thereby invokes the defendant's right to remain silent for unrelated crimes with respect to which the lawyer does not represent the defendant.

Defendant's argument is contrary to this court's holding in *State v. Sparklin*, 296 Or 85, 672 P2d 1182 (1983). In *Sparklin*, the defendant was arrested in Eugene for using a stolen credit card belonging to Mansell. The defendant asked for, and was provided with, a lawyer. While the defendant was being held in police custody in Eugene, Portland police officers questioned him about an assault that had occurred in Portland against Mansell. The Portland police also questioned the defendant about an unrelated murder that the defendant was suspected of committing. The Portland police did not obtain permission to question the defendant from the lawyer who had been appointed for the defendant on the charge relating to the stolen credit card. The defendant knowingly and voluntarily waived his *Miranda* rights and, subsequently, confessed to the murder. The defendant was tried for and convicted of the murder; his confession was used against him in court. 296 Or at 87.

On appeal, the defendant argued, as pertinent, that his invocation of the right to counsel on the stolen credit card charge precluded any police questioning of him concerning the unrelated murder. The defendant relied on his Article I, section 12, right against compelled self-incrimination. This court explicitly rejected that argument.

"We agree with the trial court that defendant's waiver of his self incrimination rights was knowing, intelligent and voluntary. Because defendant was represented by an attorney for the crimes against [Mansell,] interrogation on this subject was improper and no waiver of this right can be given effect. *However, with regard to the unrelated [murder] case, defendant's waiver is valid.*" *Id.* at 98 (emphasis added).

By logical extension, *Sparklin* stands for the proposition that, when a lawyer invokes a defendant's right to remain silent for a, specific crime, that lawyer does not thereby invoke the defendant's right to remain silent for unrelated crimes with respect to which the lawyer does not represent the defendant. Nothing in *Simonsen* detracts from that proposition.

Here, McGee was defendant's lawyer only for the Charboneau investigation. McGee invoked defendant's right to remain silent only as to that investigation. When Norman and Hefley questioned defendant concerning the Largo murder, which was being investigated separately, McGee was not representing defendant on that matter; nor did McGee ever purport to assert defendant's right to remain silent as to that investigation. *Sparklin*, not *Simonsen* is apposite. The detectives' questioning of defendant about the Largo murder did not violate defendant's Article I, section 12, rights.

### 2. *Article I, section 11, of the Oregon Constitution*

■ Defendant next argues that Norman and Hefley's questioning violated his right to counsel under Article I, section 11, of the Oregon Constitution. Defendant reasons that, because McGee represented him as to the Charboneau investigation, and because knowledge of McGee's representation in that matter could be imputed to Norman and Hefley, Norman and Hefley could not interrogate defendant about the Largo murder until after Norman and Hefley had notified

McGee of the purported interrogation and McGee had been given an opportunity to attend.

This court has stated that, under Article I, section 11,

> "once a person is charged with a crime he or she is entitled to the benefit of an attorney's presence, advice and expertise in any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of its case against defendant. * * *
>
> "* * * * *
>
> "Once an attorney is appointed or retained, there can be no interrogation of a defendant concerning the events surrounding the crime charged unless the attorney representing the defendant on that charge is notified and afforded a reasonable opportunity to attend. No waiver of that right may occur until defendant has consulted with his attorney." *Sparklin*, 296 Or at 93.

*See also State v. Davis*, 313 Or 246, 262-63, 834 P2d 1008 (1992) (stating same principles).

However, this court also has emphasized that the Article I, section 11, right to counsel is offense-specific. Thus, in *Sparklin*, the court wrote that a defendant's Article I, section 11 "right to an attorney is specific to the criminal episode in which the accused is charged. The prohibitions placed on the state's contact with a represented defendant do not extend to the investigation of factually unrelated criminal episodes." 296 Or at 95. *See also Davis*, 313 Or at 258-59 (for Article I, section 11, purposes, "counsel is deemed to represent a person on a particular charge or criminal episode"). In *Davis*, the court explicitly declined to retreat from that holding. *See id.* at 263 (so stating).

This court's holdings in *Sparklin* and *Davis* dispose of defendant's Article I, section 11, claim. As noted above, McGee's representation of defendant did not extend to the investigation of the Largo murder. When defendant was interviewed about the Largo murder, he was represented by counsel only on the Charboneau investigation, an unrelated matter. The detectives' questioning of defendant about the

Largo murder did not violate defendant's Article I, section 11, rights.

B. *Federal Constitutional Claims*

Defendant argues that the detectives' questioning violated both his Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. We disagree with both arguments.

1. *The Fifth Amendment*

■     Under the Fifth Amendment to the United States Constitution, a suspect has the right to remain silent in the face of police questioning. *See Davis v. United States*, 512 US ____ , 114 S Ct 2350, 129 L Ed 2d 362, 370 (1994) ("if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinstigates conversation"). A suspect invokes that right when, but only when, "the suspect * * * unambiguously requests counsel. * * * If the statement fails to meet the requisite level of clarity, * * * the officers [are not required to] stop questioning the suspect." *Id.* at 371.

■     As we already have discussed above, 323 Or at 54-56, defendant did not *unequivocally* invoke his right to counsel. Accordingly, when the detectives interviewed defendant, they did not violate his rights under the Fifth Amendment to the United States Constitution.

2. *The Sixth Amendment*

■     Under the Sixth Amendment to the United States Constitution, a defendant has the right to counsel and, "once [that] right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffectual." *McNeil v. Wisconsin*, 510 US 171, 175, 111 S Ct 2204, 115 L Ed 2d 158 (1991). The Supreme Court of the United States also has held that the Sixth Amendment right to counsel "is offense-specific. It cannot be invoked once for all future prosecutions * * *. Incriminating statements pertaining to other crimes, as to which the Sixth Amendment right to counsel has not yet attached, are, of

course, admissible at a trial of those offenses." *Id.* at 175-76 (internal quotation marks omitted; citation omitted).

■ As discussed above, 323 Or at 58-59, defendant had not invoked his right to counsel as to the Largo murder investigation. Accordingly, when the detectives interviewed defendant about the matter, they did not violate his right to counsel under the Sixth Amendment to the United States Constitution.

In conclusion, the trial court did not err in refusing to suppress the statements that defendant made to Detectives Norman and Hefley.

## IV. DEFENDANT'S REMAINING ASSIGNMENTS OF ERROR

Defendant raises several additional assignments of error that allegedly occurred during the guilt phase of the trial. As noted above, 323 Or at 40, 50, defendant seeks reversal of his convictions for kidnapping, assault, and abuse of a corpse. We have considered defendant's remaining assignments of error pertaining to the guilt phase of the trial and every argument made in support thereof. We find no error based on those assignments of error.

Defendant also raises several additional assignments of error pertaining to the penalty phase of the trial. Because we have reversed defendant's conviction for aggravated murder, those assignments of error are moot, and we do not consider them.

## V. DISPOSITION

The judgment of conviction is reversed with respect to the charges of aggravated murder, felony murder, and murder. The judgment of conviction is otherwise affirmed. The case is remanded to the circuit court for further proceedings.