Argued and submitted February 8, affirmed May 28, petition for review
denied August 6, 2008 (345 Or 175)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# JAMES RANDALL ECKERT,
*Defendant-Appellant.*

Washington County Circuit Court
C041579CR; A129968

185 P3d 564

George W. Kelly argued the cause and filed the brief for appellant.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Defendant appeals from a judgment of conviction for murder, advancing two assignments of error. First, he contends that the court erred in admitting a recorded telephone conversation in which he directly contradicted his trial testimony on a key fact. According to defendant, the state's failure to discover and turn over the recording until after defendant had testified amounted to a violation of the discovery statutes, and the court should have imposed a sanction of suppression. Second, defendant argues that the trial court erred in admitting evidence of his affinity with white supremacist groups. We conclude that the state did not commit a discovery violation. We also conclude that, although evidence of defendant's affinity with white supremacist groups should not have been admitted, the error in admitting it was harmless. We therefore affirm.

■ On appeal from a judgment of conviction, we view the evidence presented in the light most favorable to the state. *State v. Cunningham*, 179 Or App 359, 361, 40 P3d 1065, *adh'd to on recons*, 184 Or App 292, 57 P3d 149 (2002), *rev'd and rem'd on other grounds*, 337 Or 528, 99 P3d 271 (2004), *cert den*, 544 US 931 (2005). However, in our assessment of whether the erroneous admission of disputed evidence was harmless, we describe and review all pertinent portions of the record, not just those portions most favorable to respondent. *Id.* at 361-62 n 2. We therefore begin by reciting the facts for which there is support in the undisputedly admissible evidence, and then describe the contested evidence.

Defendant admitted at trial that he shot and killed the victim and that the incident followed an altercation that resulted from defendant's suspicion that the victim had raped defendant's girlfriend, Murray. The contested issue was whether the shooting was in self-defense.

Defendant met Murray in spring 2003, and she moved into his apartment in December of that year. After a few months, however, she moved out, because she was unable to tolerate his methamphetamine use. Two friends, Daniel, the victim's brother, and his girlfriend, Strong,

offered her a place to stay at their home, and she accepted. Also living at that home was the victim.

Because Murray was hoping to reconcile and resume her relationship with defendant, she became particularly upset when, sometime in March 2004, defendant visited the victim's brother at his and the victim's house accompanied by another woman. While Murray was upstairs "sobbing [her] eyes out," the victim comforted her and gave her whiskey and beer. That night, the victim and Murray drove to a motel, where Murray "passed right out." When she awoke, the victim was having intercourse with her.

The following afternoon, Murray stopped by defendant's apartment to pick up some belongings. Defendant, aware that she had spent the night with the victim, asked her if the victim had raped her. She responded that he had; that made defendant "very angry." In the weeks that followed, defendant went "back and forth" between believing that the victim raped Murray and that the sex was consensual. He made various statements regarding the victim, including that he "had people that would take care of [the victim] in [prison]"; that the victim "really needed to pay" for what he had done; that he "wanted to kick the shit out of [the victim]"; that the victim was "a fucking dead man"; that "[a]nybody that was around [the victim] * * * [was] going to be hurt"; and that he "wanted to kill [the victim]." Defendant also threatened the victim, challenging him to a fight on various occasions, and told the victim, during one phone call, "If I catch you lying * * * I'll kill you."

Murray moved back into defendant's apartment in May. Defendant's friend, Lawe, and defendant's brother, Young, were also living there. Around that time, defendant told Murray that the victim's brother, had "found someone who can take care of [the victim]. All we have to do is come up with a gun." Murray asked an ex-boyfriend to lend her the firearm that defendant had requested, but he declined. That same month, defendant purchased a pair of .380 caliber semi-automatic handguns.

On the morning of the day of the shooting, defendant and a friend went to the victim's house. Defendant "called [the victim] outside," threatened to "kick [the victim's] ass,"

and told the victim that he had 48 hours to leave the state, "or else." That afternoon, defendant, Murray, and a friend went to a sporting goods store to purchase camping gear and ammunition. Defendant asked the sales clerk for ammunition that would "blow things up." The clerk suggested Federal Hydrashock bullets, designed for "personal defense" and to inflict maximum damage on the human body. Murray wrote a check for a few boxes of that type of ammunition, gun holsters, a gun case, candy, and soda.

When the group returned to defendant's apartment, defendant bragged about the confrontation with the victim earlier that day and "check[ed] out" his guns. Young returned home shortly thereafter, at which point defendant again recounted the day's altercation. Murray went into a bedroom and attempted to sleep, but she was interrupted when defendant entered the room and told her that he was going to find the victim because "he just couldn't get the images out of his mind * * * and that the voices in his head wouldn't stop until [the victim] was dead."

Defendant enlisted Young to accompany him. Before leaving, Young wrapped defendant's guns in a towel and wedged them in the undercarriage of the car to conceal them, and defendant put the boxes of ammunition in the trunk. As he was leaving, defendant told Lawe that he was "going to go fuck up [the victim]." After the men left, Murray told her neighbor that defendant had gone to shoot and kill the victim.

Defendant and Young parked a short distance from the victim's house because defendant "didn't want [the victim] to see him coming." They arrived at approximately 10:30 p.m. and went upstairs with the victim's brother to the bedroom of the victim, who was not yet home. After around a half hour, the victim returned. High on methamphetamine, he "yelled and screamed," demanding to know what defendant was doing in his room. He pushed defendant and defendant pushed back. Defendant then pointed one of the guns at the victim and pulled the trigger; the gun made a "clicking sound," but did not fire. The victim pushed defendant again, causing the gun to fly up and hit defendant in the head, inflicting a wound that bled profusely. Defendant then

shoved the victim across the room and shot him in the chest. Just before leaving, defendant approached the victim and asked if he "want[ed] some more."

Young retrieved the bullet's shell casing off of the floor, and he and defendant left with the guns. Defendant then called Murray and Lawe, telling them that he had shot the victim and needed to leave the area. Murray drove herself and Lawe to a gas station to meet an ex-boyfriend, whom she asked for money, stating that she was in trouble and needed to leave because she did not want to "spend a lot of time in prison." He gave her money for gas and food. Murray and Lawe then picked up defendant and Young and drove to a nearby campground to spend the night. In the morning, the group fled east to New York, where they first learned that the victim had died.

After approximately one month in New York, they took a bus to Miami. While there, during an argument with Murray, defendant asked her, "What more do you want from me? I killed [the victim] for you." He also told Murray that he wanted to have a lightning bolt tattooed on the side of his neck; according to Murray, he told her that such a tattoo would signify that he had intentionally killed a person. However, because he wanted to have the tattoo drawn by a particular person whom he had met in prison and who was still incarcerated, he bought for the interim a charm bracelet with a lightning bolt on it. Defendant and Murray were eventually apprehended while in Miami.

So much can be inferred from the undisputedly admissible evidence. The contested evidence consisted of, first, a seven-second portion of a telephone conversation that defendant engaged in while incarcerated, introduced by the state on rebuttal, in which defendant admitted to knowingly bringing loaded guns to the victim's house on the night of the shooting. That statement directly contradicted defendant's earlier testimony that the guns were not loaded until he reached the victim's house, where the victim's brother loaded them. Second, defendant disputed the admissibility of any reference to the fact that he was associated with or had an affinity with white supremacist groups. Overruling defendant's motion *in limine*, the court allowed testimony that the

lightning bolt symbolism had significance primarily in white supremacist culture and that defendant already had several white supremacist tattoos.

■■ We begin with defendant's challenge to the recorded statement. He argues that the evidence should have been excluded because the state failed to notify him about the tape until four days after the call was recorded. The relevant statutes require the state to disclose "[a]ny written or recorded statements or memoranda of any oral statements made by the defendant" that are "within the possession or control of the district attorney," and to do so "as soon as practicable." ORS 135.815(1)(b); ORS 135.845(1). If the state learns of new evidence during trial, it must "promptly notify" the defendant. *State v. Dupree*, 164 Or App 413, 418-19, 992 P2d 472 (1999), *rev den*, 330 Or 361 (2000) (quoting ORS 135.845(2)). Whether the state's conduct amounts to a violation of these statutes is a question of law. *State v. White*, 211 Or App 210, 219, 154 P3d 124, *adh'd to as clarified on recons*, 213 Or App 584, 162 P3d 336, *rev den*, 343 Or 224 (2007).

■ While incarcerated, defendant made a telephone call in which he stated that, when he arrived at the victim's house, the gun that he used to kill the victim was loaded. The conversation was recorded by jail officials, but nobody notified defendant's counsel of that fact; the state was unaware of the recording's existence at that time. Two days later, defendant testified that the gun he brought to the victim's house was *not* loaded. The next day, the state listened to the tape, and the day after that it informed defendant's counsel of the tape's contents. Over defendant's objection, the court allowed the state, in its rebuttal case, to use the seven-second portion of the tape in which defendant made his admission about the gun.

■ As demonstrated by its admission of the contested evidence, the trial court concluded that the state committed no violation. The trial court's conclusion was not erroneous. As the state correctly points out, ORS 135.845(2) does not impose an obligation to seek out statements made by a criminal defendant; it requires only that the state "promptly notify" the defendant *if* and *when* it learns of new evidence during trial. ORS 135.845(2); *White*, 211 Or App at 219;

*Dupree*, 164 Or App at 418-19. The state was required, therefore, to disclose the existence of the tape promptly *after* it had reviewed its contents. The state's disclosure was sufficiently prompt to comply with ORS 135.845(2) because the state reviewed those contents just one day before it disclosed the existence of the tape to defendant.

We turn to defendant's contention that the court erred in admitting evidence of his affinity with white supremacist groups. Before trial, defendant filed a motion *in limine* asking the court to exclude "[a]ll reference to or mention of the defendant's affiliation with the Aryan Nation/ Brotherhood" as lacking relevance or, if relevant, as evidence whose probative value was substantially outweighed by the danger of unfair prejudice under OEC 403. In particular, defendant was concerned by testimony that the lightning bolt was a white supremacist symbol and that he already had other white supremacist tattoos on his body. The court ultimately decided to admit the testimony, ruling: "I think the lightning bolt evidence does come in, and I think it is fair to put it into context to where Ms. Murray can indicate that [defendant] had * * * white supremacist type tattoos."

Murray subsequently testified as follows:

"Q: Did [defendant] at any time express to you that there was some type of insignia that he would now be entitled to, as a result of having killed [the victim]?

"A: Yeah. He bragged that he would now be able to get a lightning bolt on the side of his neck as a representation of the murder because it—I don't remember the words that he used, but because he was now—it was a certified murder that it was in print that he had murdered [the victim], and so he would be able to get the lightning bolt on the side of his neck.

"Q: And did—was that in reference to a white supremacy group that [defendant] shared a philosophy with?

"A: Yes.

"Q: And did he already have tattoos on his body that were representative of a white supremacy philosophy?

"A: Yes.

"Q: Was he proud of the fact that he was now going to be able to get this lightning bolt tattoo?

"A: Yes.

"Q: Did he indicate to you that he planned to do so?

"A: Yes."

On appeal, defendant concedes that Murray's testimony regarding his desire to memorialize the victim's death with a lightning bolt tattoo was relevant as evidence of his state of mind when he killed the victim; he argues, however, that the trial court erred when it allowed the state to introduce evidence of his affinity with white supremacist groups. He contends that the evidence is not relevant to any fact at issue and, even if it is, the probative value of such evidence was substantially outweighed by its prejudicial effect. According to defendant, "[t]he average juror views such people with alarm and disgust" and "as likely to be violent." The state, however, contends that defendant's desire to have a lightning bolt tattoo was relevant to show his state of mind when he shot the victim; that, to make that relevance clear, it was necessary to establish the significance of the lightning bolt in a group with which defendant had an affinity; and that the existence of defendant's other tattoos indicating association with that group provided context to corroborate that affinity.

■■ The logic of the state's argument is unimpeachable. The problem, nonetheless, is that the argument does not engage defendant's objection. Without ever mentioning white supremacy or any other politically or socially offensive credo, the state could have established that defendant wanted a lightning bolt tattoo; that such tattoos, in a particular subculture, signify that the person bearing them has intentionally killed a person; and that defendant already had other tattoos on his body indicating affinity for that subculture. The fact that the subculture espoused white supremacist views simply has no relevance to the inference that the state wanted the jurors to draw. Further, because the victim was *white*, the racist orientation of the subculture had no bearing whatsoever on defendant's motive. Indeed, defendant's

motive—jealousy—was never contested. Fully acknowledging that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," OEC 401, and that the rule establishes a "very low threshold," *State v. Hampton*, 317 Or 251, 255 n 8, 855 P2d 621 (1993) (internal quotation marks omitted), we nonetheless conclude that the evidence of defendant's affinity with white supremacist subcultures was irrelevant.

■     However, we must affirm the jury's verdict despite evidentiary error if there is little likelihood that the error affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Defendant asserts that "had the jurors not been told that defendant is a white supremacist with white supremacist tattoos, at least some of the jurors might have voted for an acquittal." He relies on four bases for that assertion: first, the only witnesses who were present during the shooting, defendant and Young, testified that they went to the victim's residence to show the victim's brother the guns only after the brother assured defendant that the victim would not be home; second, they also testified that the victim assaulted defendant and was continuing that attack when defendant shot him in self-defense; third, the state's evidence of defendant's intent was circumstantial—namely, statements that defendant made before and after the shooting; and fourth, the state's primary witnesses, Murray and Lawe, had both made deals with the state in exchange for their testimony, thereby casting doubt on their credibility.

We are not persuaded. The jury was presented with overwhelming evidence of defendant's guilt. Important parts of that evidence are not in dispute. Defendant himself admitted that he had called and threatened to kill the victim when he first learned of Murray's allegation in March of 2004. He also admitted telling the victim that he would "kick [his] ass" just hours before the shooting. Furthermore, the facts that defendant and Young parked some distance away from the house on the evening of the shooting, that Young retrieved and ultimately disposed of the bullet's shell casing, and that the group fled the state immediately following the shooting are highly suggestive of defendant's intent.

Moreover, the state was able to corroborate much of Murray's and Lawe's testimony, thereby establishing their credibility to the jury, through the testimony of Murray's neighbor that Murray told her that defendant had gone to shoot the victim; of Murray's ex-boyfriend who refused to sell defendant a handgun; of the woman who *did* sell defendant two handguns; of a friend and associate of both defendant and Murray who testified to defendant's statements that the victim was "a fucking dead man" and that "[a]nybody that was around [the victim] * * * [was] going to be hurt"; of the sporting goods store employee who sold defendant the ammunition; and of Detective Schrader, who stated that defendant was wearing a lighting bolt bracelet when he was apprehended in Miami. Lastly, the state effectively impugned defendant's credibility when it introduced the taped telephone conversation in which he directly contradicted his earlier testimony.

Given the overwhelming evidence of defendant's guilt in this case, we conclude that there is little likelihood that evidence of defendant's association with white supremacist groups, an ancillary matter at best, would have affected the verdict. Defendant argues that such evidence was prejudicial because "[t]he average juror views such people with alarm and disgust" and "as likely to be violent." Yet even without the white supremacist evidence, the jury heard ample evidence of defendant's "alarm[ing]," "disgust[ing]," and "violent" conduct. He was a methamphetamine user. He made repeated threats to kill the victim. He repeatedly tried to lure the victim into a fight. He had spent time in prison, as had several of his companions. He bought ammunition designed to inflict maximum damage on human bodies. He went to the victim's house intending to inflict violence on him. The fact that he also had admiration for, and may even have been a member of, a racist organization could not have added a significant quantum of disapproval of or animus toward him. The error, therefore, was harmless.

Affirmed.