Submitted November 15, 2011, affirmed June 27, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOEL SANCHEZ-JACOBO,
aka Joel Sanchezjacobo,
*Defendant-Appellant.*

Multnomah County Circuit Court
060733948; A139993

282 P3d 880

Peter Gartlan, Chief Defender, and Mary M. Reese, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Ryan Kahn, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Brewer, Judge, and Sercombe, Judge.

BREWER, J.

**BREWER, J.**

Defendant was convicted after a jury trial of aggravated murder, murder, coercion, and unlawful use of a weapon. The trial court imposed a sentence of life imprisonment without the possibility of parole for the aggravated murder conviction, with various other sentences to run consecutively or concurrently. Defendant appeals, raising numerous challenges to his convictions. We reject all but two of his arguments without discussion, but write to address (1) his contention that the trial court erred in overruling his objection to his wife's testimony that, as the result of a plea bargain, her sentence had included "a contract to go to court and tell the truth," and (2) his assertion that the trial court was required *sua sponte* to grant a mistrial or give a curative instruction based on the prosecutor's comment in closing argument to the jury that, "at this point in the trial, the presumption of innocence will evaporate." As explained below, we conclude that the trial court properly overruled defendant's objection to his wife's testimony and, although defendant is correct that the prosecutor's statement to the jury was legally erroneous, we decline to exercise our discretion to correct that unpreserved error. Accordingly, we affirm.

Because defendant was convicted after a jury trial, we set out the facts in the light most favorable to the state. *State v. Johnson*, 342 Or 596, 598, 157 P3d 198 (2007), *cert den*, 552 US 1113 (2008). This case concerns the events surrounding the murders of two men, Rodelfo Romero-Lopez, Jr. (Junior), and Alex Sanchez-Hernandez (Alex), that occurred approximately a month apart. Defendant and the two victims were from the same small community in Mexico; Alex was defendant's cousin, and Junior, although apparently not related, also referred to defendant as a "cousin." As explained in more detail below, defendant, Junior, Alex, and defendant's wife, Christina Sanchez (Christina), all were involved in the distribution of methamphetamine.

In the spring of 2006, defendant and Christina were not living together; Christina lived in Woodburn, and defendant lived in the townhouse of another woman in Scappoose. Junior lived in the same townhouse in Scappoose. Alex lived in an apartment in Gresham. Alex dealt in large quantities of

methamphetamine. Defendant also supported himself by selling methamphetamine, some of which he obtained from Alex. Junior, along with Gerardo Vasquez-Villagomez (El Negro) and Jose Zamora-Camacho (Pepe) were associates of defendant in his drug-related activities. Christina also sold methamphetamine, which she generally obtained from defendant. However, on several occasions in the spring of 2006, Christina obtained methamphetamine directly from Alex without defendant's knowledge.

Another individual, Daniel Contreras-Gonzales, was introduced to defendant by Junior, and defendant sometimes gave him methamphetamine in exchange for transportation. One day in the spring of 2006, defendant and Contreras-Gonzales were together in one of defendant's trucks, travelling to the townhouse in Scappoose, when several bags of drugs slid from beneath the seat. Defendant asked Contreras-Gonzales to push them back under the seat. After they arrived in Scappoose, defendant asked Junior to fetch the drugs from the truck, after which defendant discovered that some of the drugs were missing. Defendant accused Junior and Contreras-Gonzales of taking the drugs. Defendant then told Contreras-Gonzales to give his car to defendant. Contreras-Gonzales was frightened, and he gave defendant the car.

Several weeks later, defendant drove to Contreras-Gonzales's apartment and told Contreras-Gonzales to get in to his car. Junior was sitting in the front passenger seat, and Contreras-Gonzales was seated between El Negro and Pepe in the back. Defendant gave El Negro some money and told Contreras-Gonzales that he had paid El Negro and Pepe to kill him and Junior. Defendant then drove Contreras-Gonzales back to his apartment. About a week after that, defendant again came to Contreras-Gonzales and instructed him to get into defendant's vehicle. Defendant drove Contreras-Gonzales to a remote location, showed him a gun, and said that, "if somebody killed a dog around here, nobody would find it." Contreras-Gonzales was afraid that defendant would kill him. Defendant then told Contreras-Gonzales that Contreras-Gonzales would need to give defendant $100 per week, and Contreras-Gonzales agreed. Defendant's convictions for coercion and unlawful use of a weapon stemmed from those events.

In the week leading up to his murder on May 31, 2006, Junior exhibited anxiety and indicated to other people that he was having problems with defendant. On the evening of his murder, Junior was with his friend, Nicole Weber, smoking methamphetamine outside an apartment complex in Portland. A white pickup truck like one that defendant owned arrived; Junior got inside the truck, and he remained there for less than five minutes. The person inside the truck was described to Weber as Junior's "cousin." Weber and Junior then got into Junior's car and used more methamphetamine. Shortly thereafter, El Negro and Pepe walked by, and Junior told Weber that they were "there for him." Junior and Weber then went to a nearby apartment and Junior asked if he could borrow the telephone. As Junior stood outside the apartment, and attempted to make telephone calls, El Negro and Pepe approached. Junior asked a person inside the apartment to call 9-1-1. El Negro looked at Weber and said, "I'm sorry," then shot Junior in the chest. Junior died of the gunshot wounds. An analysis of the bullets showed that they had been fired from a weapon that used 38-caliber ammunition.

Several days after Junior's murder, defendant travelled to Modesto, California, with Christina and El Negro, to purchase methamphetamine. During that trip, defendant physically and verbally abused Christina, accused her of cheating on him, and said "that's why I took care of that motherfucker." Defendant told a friend that they were visiting that Christina "made me kill my cousin." Defendant later told the same person that he had had problems with Junior because of "some things that [were] taken." During that visit, defendant hid a handgun in a box near the friend's house; that gun was consistent in appearance with the type of weapon that had been used in Junior's murder. On June 24, 2006, defendant and Christina again visited Modesto to obtain methamphetamine. During that trip, defendant retrieved the gun that he had hidden during his previous visit.

On July 9, defendant, El Negro, and Pepe drove to Christina's house in Woodburn in defendant's black Cadillac Escalade. They left sometime early that evening in the same vehicle. Later that evening, defendant, El Negro, and Pepe went to Alex's apartment in Gresham. All three men entered

the apartment, and defendant spoke with Alex. El Negro and Pepe both had guns. Alex's friend Garcia-Garcia was present in the apartment, and defendant told him that, if he said anything, something would happen to him. Defendant told El Negro and Pepe to "do what they had to do" in 10 or 20 minutes, then defendant left the apartment. Shortly thereafter, one of the two gunmen said "lo siento" (which means "I'm sorry" in Spanish) to Garcia-Garcia, then shot Alex in the head. Both gunmen fled through the back door of the apartment. The state adduced evidence that the gun used to kill Alex was the same gun that had been used to kill Junior. Investigators also found Pepe's palm-print near the scene of Alex's murder.

After the shooting, Garcia-Garcia ran next door to the apartment of Alex's brother, Gutberto Sanchez-Hernandez (Gutberto). Gutberto went to Alex's apartment, saw that he had been shot, and then returned to his own apartment to ask his wife to call 9-1-1. Gutberto saw defendant sitting in the parking lot in the Escalade, and he approached. Defendant told Gutberto to go talk to Alex and to the other two people who were inside Alex's apartment. Gutberto asked defendant if he knew the other two people that were inside, and defendant replied that he did. Gutberto then informed defendant that Alex had been shot. Defendant appeared upset and angry, and drove away quickly.

Defendant returned to Christina's house in Woodburn in the early morning hours of July 10. He took some money and exchanged vehicles with Christina, leaving the Escalade with her. Defendant, El Negro, and Pepe then drove Christina's vehicle to Modesto, where a friend checked them into a motel under an assumed name. Christina met with several of defendant's relatives in Portland, at which time a murder was discussed; after that meeting, Christina hid the Escalade in a friend's garage. Defendant, El Negro, and Pepe were arrested when they returned to Oregon on July 14, and Christina was arrested, as well.

At trial, Christina testified for the state as to the events described above during which she was present.[1]

---

[1] Christina did not testify about any communications that were subject to the spousal privilege.

Because some of Christina's testimony is pertinent to defendant's first assignment of error, we describe it in detail. As an initial matter, in his opening statement, the prosecutor told the jury that Christina had been convicted of tampering with evidence and hindering prosecution based on her activities after Alex's murder. He further stated that she had received a sentence of probation:

"And, in return for that sentence, a non-jail sentence, although jail is hanging over her head if she violates the conditions of probation the judge could send her to jail, but in exchange, she agreed to testify before the Multnomah County Grand Jury, and she has agreed to testify before this jury[.]"

The prosecutor then described what he expected Christina's testimony to be, and, in fact, Christina's testimony was essentially as described. During her direct examination, Christina was asked about her convictions for hindering prosecution and tampering with evidence. The following exchange occurred:

"Q: And do you remember what your sentence was?

"A: Yes.

"Q: Can you tell the jury?

"A: Time served, three years' probation, ten years on my record, 160 hours' community service, and a contract to go to court and tell the truth."

Defense counsel objected, asserting that Christina's testimony constituted improper "vouching" and "bolstering." The trial court overruled the objection.

As pertinent to defendant's remaining assignment of error, at the beginning of his closing argument, the prosecutor stated:

"Ladies and gentlemen, at this point in this trial, the presumption of innocence will evaporate. The state has proven to you beyond a reasonable doubt, beyond really any doubt that the defendant committed these crimes."

No objection was made to that statement. As noted, the jury ultimately convicted defendant of the aggravated murder of Junior (based on having paid El Negro and Pepe to commit

the crime), the murder of Alex, and coercion and unlawful use of a firearm with respect to Contreras-Gonzales.

We first address defendant's assertion that the trial court erred in admitting into evidence Christina's statement that she had a "contract" to "tell the truth." Defendant relies on *State v. Eby*, 296 Or 63, 673 P2d 522 (1983), for the proposition that a witness's plea agreement that includes a provision to tell the truth is not relevant evidence. The state remonstrates that defendant did not object to the testimony on relevance grounds, but, instead, referred to "bolstering" and "vouching." From that difference, the state contends that defendant's argument is not preserved. We disagree. Our review of the colloquy between counsel and the trial court satisfies us that defense counsel's reference to vouching and bolstering, in the context of an objection to the admissibility of a provision of a plea agreement involving a promise to tell the truth, adequately alerted the court to the legal issue presented on appeal.

In *Eby*, a deputy district attorney testified that he had entered into an agreement with a witness, Bigornia, that granted Bigornia immunity for hindering prosecution with respect to the disposal of a weapon. The agreement required "Bigornia [to] testify truthfully and completely at all hearings regarding the homicide." *Eby*, 296 Or at 68, 70. The defendant objected to the testimony as irrelevant and unduly prejudicial; on appeal, the parties framed the issue as whether the evidence involved impermissible "vouching" for the witness. *Id.* at 69-71. The Supreme Court, while disclaiming the "vouching" label, stated:

> "When the defendant chose the word 'vouch,' we believe the defendant meant that testimony about the witness agreeing to testify truthfully constituted an improper attempt to bolster the witnesses' credibility. The defense never objected to the fact of the immunity agreement, but only to its condition that the witness agreed with the prosecutor to testify truthfully. The objection to this condition was that 'it doesn't have any probative value and it's prejudicial.' The defendant is correct that this condition to the immunity agreement is not relevant; however, its admission was not prejudicial."

*Id.* at 72-73. The evidence was not relevant, the court explained, because it "does not tend to prove or disprove credibility." *Id.* at 75.[2]

The Supreme Court addressed a similar issue in greater depth in *State v. Charboneau*, 323 Or 38, 913 P2d 308 (1996). In that case, a participant in a murder, Smith, testified that "he had entered a plea agreement with the state in exchange for his testimony at defendant's trial." *Id.* at 42. After Smith was cross-examined about whether the plea agreement provided a motive to testify in the state's favor, on redirect examination the state offered the plea agreement itself into evidence. In particular, the state asserted that the agreement was admissible to rehabilitate the witness, in light of a provision that it would be "null and void" should Smith not testify truthfully. *Id.* The agreement provided:

> " *"The primary reason for this agreement is that, based on Smith's statements and on its investigation, the State believes this charge accurately reflects the role Smith played in the death of [the victim].*

> " '* * * * *

> " 'Smith's representation that [the victim's] death was primarily accomplished by other persons is a basic premise for this agreement. *Although the state has reason to believe this is true*, if that premise is demonstrated to be incorrect, this agreement is null and void * * *[.]' "

*Id.* at 42-43 (emphasis and omission in original).

In addressing the admissibility of the plea agreement, the court first concluded that, "[a]s *Eby* suggests, there are limits to the ways in which a party may bolster the credibility of its witnesses. Three other lines of cases sound similar themes and are relevant to our analysis today." *Id.* at 45. The first of those three lines of cases concerned the admissibility of a plea agreement that required a witness to "take a polygraph examination as to the truthfulness of his statement[.]" *State v. Snider*, 296 Or 168, 170, 674 P2d 585 (1983).

---

[2] In concluding that admission of the evidence was not reversible error, the court noted that it was admitted "after a more culpable prosecution witness had previously testified to exactly the same condition of a similar immunity agreement before the same jury without objection." *Id.* at 73.

Although the issue on appeal in *Snider* concerned the reference to the polygraph, the court in *Charboneau* noted that *Snider* also more broadly held that

> " '[t]he vice of such evidence is that a jury might give special credence to the testimony of the state's witness because of the binding force of the plea bargain, implying a guarantee of the witness's veracity.' "

*Charboneau*, 323 Or at 46 (quoting *Snider*, 296 Or at 172).

The second line of cases concerned the principle that "a witness may not testify about the credibility of another witness." *Id.* at 46 (quoting *State v. Keller*, 315 Or 273, 285, 844 P2d 195 (1993)); *see also State v. Middleton*, 294 Or 427, 657 P2d 1215 (1983) (witness may not give an opinion on whether another witness is telling the truth). The court noted that those cases were not directly applicable to the circumstances in *Charboneau*, because no witness in that case had testified as to Smith's credibility. The court continued:

> "Nonetheless, what happened here through the plea agreement is analogous. The state could not have called the investigating detective to testify: 'Based on Smith's statements and on my investigation, I believe that the charge of felony murder accurately reflects the role Smith played in the crime.' "

*Charboneau*, 323 Or at 47. Finally, the court relied on a line of cases holding that an attorney may not state his or her personal opinion as to the credibility of a witness at trial. *See, e.g., State v. Parker*, 235 Or 366, 384 P2d 986 (1963).

Drawing on those lines of cases, as well as *Eby*, the court in *Charboneau* synthesized the following holding: "*A witness's testimony or an exhibit may not, explicitly and directly, contain an opinion as to a trial witness's credibility.*" *Charboneau*, 323 Or at 48 (emphasis added). After recognizing that corroborating evidence may properly bolster a witness's credibility, and that a lawyer may permissibly argue to the jury that it should find facts in accordance with a witness's testimony, the court cautioned that its holding was narrow:

"Our holding today is limited to the inadmissibility of the portions of the plea agreement containing the state's opinion that it finds Smith to be credible. Nothing in this opinion should be read to suggest that other portions of a plea agreement are necessarily inadmissible. Nor should this opinion be read to suggest that a witness may not be rehabilitated by asking about the substantive terms of a plea agreement, including a provision that the agreement is void if the witness commits perjury."

*Id.*

Thus, to summarize, in *Eby*, the objectionable testimony was a prosecutor's statement that a witness had made an agreement with him to testify truthfully. *Eby*, 296 Or at 70. Similarly, in *Charboneau*, the objectionable material in the plea agreement was the statement that "the state" believed a witness's recounting of a murder to be accurate. *Charboneau*, 323 Or at 42-43.

We conclude that the circumstances of this case are meaningfully distinguishable from those in *Charboneau* and *Eby*. We emphasize that defendant does *not* suggest that the fact that Christina was testifying pursuant to a plea agreement was improperly before the jury.[3] She testified, in effect, that when she was sentenced pursuant to that agreement, the court had ordered her to tell the truth. Christina's description of her sentence under the plea agreement did not imply that either a specific prosecutor or "the state" in general believed that she was telling the truth. Like any other witness, Christina had already sworn to tell the truth when she took the witness stand. A witness's assertion under oath that he or she is being truthful simply is not the type of evidence that a jury might improperly view as a "guarantee of the witness's veracity." *Charboneau*, 323 Or at 46 (quoting *Snider*, 296 Or at 172). Stated differently, a witness does not impermissibly "vouch for" or "bolster" his or her *own* testimony by proclaiming truthfulness.

---

[3] Defendant states in his opening brief:

"Defendant did not object to the admission of the cooperation agreement below and does not challenge its admission on appeal; the agreement was evidence of Christina's bias against defendant and her motive to testify in a way that pleased the state. Defendant contests only that provision of Christina's plea bargain that she 'tell the truth.'"

Of course, it could be inferred from the fact that the state has called a witness that the state expects the witness to testify in a manner that will help the state's case. As the court noted in *Charboneau,*

> "when a lawyer presents a witness and argues to the jury that it should find facts in accordance with that witness's testimony, the jury may infer that the lawyer believes the witness. That circumstance, which usually is present, also is permissible."

*Id.* at 48. Here, as noted, the parties acknowledged that the fact that Christina was testifying pursuant to a plea agreement was properly before the jury. The state has suggested that the agreement gave Christina incentive to provide accurate testimony; defendant, on the other hand, has asserted that it demonstrates Christina's bias and her motive to testify favorably to the state. Both of those arguments are, under the court's reasoning in *Charboneau,* "fair game." What would be impermissible is the admission of evidence directly indicating that a prosecutor, or another witness, "believes" a witness's testimony. That did not occur here. Accordingly, the trial court properly overruled defendant's objection to the challenged testimony.

We turn to defendant's remaining assignment of error. As noted, at the outset of his closing argument, the prosecutor commented to the jury—without objection—that, "at this point in trial, the presumption of innocence will evaporate." Defendant asserts, and we agree, that that was an incorrect statement of the law. We addressed this subject at length in *State v. Worth,* 231 Or App 69, 218 P3d 166 (2009), *rev den,* 347 Or 718 (2010). In *Worth,* the prosecutor first told the jury during closing argument that the defendant "now does not sit before you presumed innocent." *Id.* at 72. Defense counsel objected, and the court instructed the jury that the defendant was presumed innocent. The prosecutor then continued that the defendant "for a few more minutes, sits before you presumed innocent, until you shut that door and start deciding." *Id.* at 73. Counsel again objected, but the trial court overruled the objection. The prosecutor then reiterated that, "[w]hen that door shuts, when you sit down and you take your initial vote the presumption of innocence is over."

*Id.* In his closing argument, defense counsel contradicted the prosecutor's statements, telling the jury that the defendant "is presumed innocent as you deliberate." *Id.* We concluded that, under well-established law, the prosecutor's statements were incorrect, because "the presumption of innocence is a disputable question which goes with the jury into the jury room for consideration." *Id.* at 76 (quoting *State v. Elliott*, 234 Or 522, 527, 383 P2d 382 (1963)). We noted that, as an initial matter, the court properly instructed the jury after the prosecutor's first misstatement that the presumption of innocence was still in place. However, we concluded that the court's overruling of the subsequent objections was problematic, as the court's first instruction "did not fully address the problems created by the prosecutor's subsequent misstatements." *Worth*, 231 Or App at 77.

We noted, however, that a court has discretion whether to grant a mistrial due to a prosecutor's misstatement during argument and that the court does not abuse its discretion in denying a mistrial "unless the effect of the prosecutor's conduct was to deny a defendant a fair trial." *Id.* at 75 (citations omitted). In concluding that the defendant in *Worth* was denied a fair trial, we noted that the court overruled the defendant's objection to the misstatement in the presence of the jury and that the jury was given conflicting information about the presumption of innocence by the prosecutor and defense counsel. We concluded that "[t]he overruling of that objection gave the jury reason to think that the prosecutor's statement was, in fact, a correct statement of the law" and that the court's subsequent instructions concerning proof of guilt beyond a reasonable doubt "did not provide guidance as to the longevity of the presumption of innocence, such as to remove confusion about whether the presumption of innocence extended through jury deliberations." *Id.* at 79.

Here, in contrast to *Worth*, defendant did not object to the prosecutor's remark. Thus, our initial consideration is whether the trial court's failure *sua sponte* to deliver a curative instruction or declare a mistrial constitutes reversible error that is apparent on the face of the record. An error is apparent when (1) the error is legal; (2) the legal point is obvious, meaning that it is not reasonably subject to dispute; and (3) the error appears on the face of the record, such that we

need not go outside the record or choose between competing inferences to establish it. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). Here, the error is legal—it concerns a misstatement of the law. Moreover, in light of *Worth* and the cases that preceded it, the legal issue—that the presumption of innocence continues through jury deliberations—is not reasonably subject to dispute. Nor do we need to go outside the record or choose between competing inferences here—the error concerns a brief, simple misstatement of a point of law.

The striking point is whether this is an appropriate case to exercise discretion to correct the error. In making that determination, we consider

"the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, i.e., whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382 n 6, 823 P2d 956 (1991).

Regarding the nature of the case and the competing interests of the parties, we note that this was an aggravated murder case that took approximately a month to try, including extensive *voir dire* of potential jurors. The trial court carefully explained to the potential jurors on *voir dire*, and to the impaneled jurors and alternate jurors both in its preliminary instructions and in its final instructions before the jury deliberated, that the state bore the burden to prove its case against defendant beyond a reasonable doubt and that the jury was to decide the case *after* considering all of the evidence. The court reiterated that defendant was presumed innocent until the state had proved his guilt beyond a reasonable doubt, and it admonished the jury not to attempt to decide the case until deliberations had begun. Thus, defendant's interest in receiving a fair trial, in terms of the proper instruction of the jury on its role, was satisfied here.

Regarding the "gravity of the error" and the "ends of justice," we acknowledge that a prosecutor's misstatement of

the law can, in some circumstances, produce grave harm if not corrected. Here, however, the misstatement was brief, it was made in passing, and it went unremarked by the parties and the court. Thus, it did not bespeak of the gravity of the error in *Worth*, where the jury's attention was called to the prosecutor's multiple misstatements of the law by objections, and the jury was led by the trial court, who overruled some of those objections, to believe that those misstatements of the law were accurate. Moreover, as noted, the jury here was given ample, specific instructions about how to carry out its deliberations, and there is no indication in the record that the prosecutor's misstatement had any effect on the jury's performance of its charge.

Finally, the policies behind the rules of preservation, including whether the court was given an opportunity to correct any error, weigh heavily against correcting the error here. The misstatement was brief, not central to the state's closing argument, and it apparently escaped the attention of the attorneys and the court. Had it been brought to the trial court's attention, the court could have remedied the problem by giving a curative instruction to the jury. We have no doubt that it would have been within the court's discretion to remedy the error in that manner, because the error was not so egregious that a mistrial would have been the only permissible remedy.

In sum, the trial court properly admitted the challenged testimony by the witness, Christina Sanchez. Although a brief misstatement of the law was made by the prosecutor during the closing argument, it did not constitute the type of plain error that we choose to exercise our discretion to correct.

Affirmed.