Submitted December 23, 2014, affirmed July 27, 2016

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JONELL HENRY JAMES,
aka Jonell M. James,
*Defendant-Appellant.*

Multnomah County Circuit Court
110933844; A153312

379 P3d 626

Peter Gartlan, Chief Defender, and Lindsey K. Detweiler, Deputy Public Defender, Office of Public Defense Services, filed the opening brief for appellant. Jonell James filed the supplemental brief *pro se.*

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Matthew J. Lysne, Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Chief Judge, and Tookey, Judge.

**HADLOCK, C. J.**

Defendant appeals a judgment of conviction for first-degree assault with a firearm (ORS 163.185), two counts of first-degree robbery with a firearm (ORS 164.415), unlawful use of a weapon with a firearm (UUW-firearm) (ORS 166.220), and felon in possession of a firearm with a firearm (FIP-firearm) (ORS 166.270). In six assignments of error, defendant challenges the trial court's denial of his objection to purported "vouching" evidence, its denial of a mistrial motion, its failure to merge the guilty verdicts for UUW-firearm and FIP-firearm, its imposition of upward-departure sentences on two convictions, and its denial of defendant's request for a "unanimous verdict" jury instruction. Defendant also raises two assignments of error in a *pro se* supplemental brief. We write only to address defendant's vouching and merger arguments; we reject the remainder of defendant's arguments without further discussion. With respect to vouching, we conclude that any error associated with the trial court's denial of defendant's objection was harmless. With respect to merger, we conclude that the trial court did not plainly err. Accordingly, we affirm.

## I. BACKGROUND

For context, we begin with a brief overview of the facts, many of which are not meaningfully disputed. Later in the opinion, we describe the evidence in more detail as it pertains to the arguments that defendant raises on appeal. *See State v. Eckert*, 220 Or App 274, 276, 185 P3d 564, *rev den*, 345 Or 175 (2008) (in assessing "whether the erroneous admission of disputed evidence was harmless, we describe and review all pertinent portions of the record").

The charges against defendant relate to a shooting that occurred after a proposed marijuana sale resulted in an altercation between the prospective purchasers (defendant and his brother, Collins) and the prospective sellers (Hamm and Schnippel). On the evening in question, Collins called Hamm and arranged to buy marijuana from him. Hamm and his friend Schnippel arranged to meet Collins at a park to engage in that transaction. When Hamm and Schnippel

arrived at the park, they discovered that Collins was accompanied by another man, defendant. Collins and defendant became angry, possibly because Hamm had not brought the amount of marijuana that they had hoped to purchase. An argument ensued, during which Hamm hit one or both of the other men with a stick that witnesses characterized as being like a "shish kebab skewer." At some point, Hamm dropped or put his cell phone on the ground. Collins ran from the scene, taking Hamm's cell phone and some other items with him. Defendant subsequently shot Hamm, injuring him gravely. The parties disputed who had been the aggressor and whether defendant and Collins had set out to (and did) rob Hamm and Schnippel, or whether, instead, defendant had acted in self-defense after Hamm attacked defendant and Collins.

The state charged defendant with attempted aggravated murder, one count of first-degree assault (against Hamm), one count of second-degree assault (against Hamm), two counts of first-degree robbery (one count for each of the victims, Hamm and Schnippel), two counts of second-degree robbery (one count for each victim), UUW, and FIP, all alleged to have been committed with a firearm. The jury found defendant guilty of all counts except attempted aggravated murder. The trial court merged the guilty verdict for second-degree assault into the guilty verdict for first-degree assault and similarly merged the verdicts for second-degree robbery into the verdicts for first-degree robbery. After finding bases for upward-departure sentences on two of the convictions, the court sentenced defendant to a total of 338 months of incarceration.

## II.  ANALYSIS

### A.  *"Vouching"*

On appeal, defendant first challenges the trial court's denial of his motion to strike testimony regarding a cooperation agreement that Collins entered into with the state. Because the prosecutor's inquiry, Collins's testimony, and defendant's objections all are important to our analysis, we set out the pertinent parts of the transcript in some detail.

The state presented several witnesses, including Hamm and Schnippel, who testified to the events described above.[1] The state also called Collins, who testified pursuant to a cooperation agreement. Evidence about that agreement was introduced shortly after Collins began testifying and asserted that he had been assaulted during the incident at the park. At that point, the prosecutor asked Collins whether he had "entered into an agreement with the State of Oregon to provide truthful testimony in this case?" After a sidebar discussion with the court, the prosecutor continued to question Collins about that agreement:

"Q   Isn't it true under the terms of the agreement that you had entered into with the testimony it calls for your truthful testimony *as given to law enforcement*?

"A   Yes, but I believe that I was also misleading to that testimony.

"Q   Excuse me?

"A   I believe I was also misled to that—into that other agreement by my attorney, somethin' I haven't spoke up before in the past and don't believe I was gettin' the right representation.

"Q   I'm gonna hand you a document. * * * You look at that document and tell me if you recognize that document.

"A   (Pause.) Yes.

"Q   Is that your signature on that document?

"A   Yes.

"Q   And before you signed that document, do you recall having a conversation with your attorney present, that we were all in the room together to sit down and talk and to talk only and there was no deals on the table, no promises made to you whatsoever, and we were just simply there to talk and then we would discuss if there would be future negotiations?

"A   Not exactly, but I remember hearin' a few things about my attorney not exactly tellin' me everything that I should have known from the beginnin'.

---

[1] The state called additional witnesses who gave testimony from which a factfinder could infer that defendant had intended to commit robbery and that, after the incident in the park, defendant had gotten rid of the gun with which he shot Hamm and had asked another person to persuade Hamm not to testify.

"Q    Like what?

"A    That I would be happy to take the—the witness stand.

"* * * * *

"Q    So Mr. Collins, why don't you tell us what happened on that night?

"A    Where I left off was that after I was assaulted, kinda started defending myself and (pause) Pretty much we (pause)—"

(Emphasis added.) Collins's attorney said that he had a matter for the court, and the court excused the jury.

Defense counsel then reiterated his objection to the line of questioning, asserting that he "had objected to the prosecutor characterizing the agreement as Mr. Collins testifying truthfully." The court's response indicated that it understood defendant to have made a vouching objection, and it overruled that objection on the ground that the prosecutor had not vouched for Collins's credibility:

"THE COURT:    I am quite confident that no one could have * * * interpreted that line of questioning as vouching for the testimony that * * * the witness was giving. I think—

"[DEFENSE COUNSEL]:    I think that there is—

"THE COURT:    I think that he was engaged in an impeachment of that witness.

"[DEFENSE COUNSEL]:    There's case law.

"THE COURT:    There is no question that—that either party can't vouch, either attorney, any attorney can't vouch, but that just isn't my interpretation of what was happening by referring to an agreement which is in those terms.

"[DEFENSE COUNSEL]:    Your Honor, I think there is case law that says admission of a document that includes that type of (indiscernable) which is grounds for a mistrial, * * * so at this point I am asking for a mistrial.

"THE COURT:    If you have case law to show me, I'll certainly look at that case law when the appropriate time comes."

After the jury returned to the courtroom, the prosecutor again questioned Collins about his cooperation agreement:

"Q Mr. Collins, let's—let's try this again. You entered into an agreement with the State for your testimony here today, is that correct?

"A Yes."

Following additional inquiry about the nature of the agreement, the prosecutor returned to the events at the park and the investigation that followed:

"Q * * * What did you tell police that happened that night? Let's just start from the point where you said you were assaulted.

"A I told him—well, Detective Hollins was—he was actually saying a lot of stuff to me and a lot of—some stuff that I agreed to which wasn't exactly true. And as far as the assault, I was assaulted and I started to—to defend myself and also—was defendin' also [defendant]."

Collins continued to describe the altercation and asserted that defendant "wasn't fighting, but he was trying—trying to defend me, us" from Hamm and Schnippel. Collins stated that, as the argument continued, he picked up some cell phones that were on the ground, which he believed belonged to Hamm or Schnippel, and then took off running. Collins testified that he then heard a gunshot, but he did not see what had happened.

At that point, the prosecutor reminded Collins that, if he did not abide by the terms of the cooperation agreement, he would be sentenced to prison "for a very long time." The prosecutor continued:

"Q And I'm gonna ask you right now, didn't you tell Detective Hollins in a recorded interview before you even had an attorney, before you even had a deal made on the table, that [defendant] pulled out a gun and pointed it at [Hamm] and [Schnippel] and ordered them to empty their pockets?"

Collins agreed that the detective who interviewed him (Hollins) had described events that way, but Collins asserted that he had told Hollins "that that exactly wasn't what

happened." Collins testified that the detective was trying to have Collins admit that Collins and defendant had engaged in "a setup robbery." Collins denied having said that he and defendant had gone to the park with the intent to commit a robbery. Collins said that some of what he previously had told law enforcement officers about this case was not true; he also acknowledged that any such untruthfulness itself could be a breach of his agreement. He denied having seen defendant pull a gun, and he denied having heard defendant tell Hamm and Schnippel to empty their pockets.

After Collins gave that testimony, the prosecutor prepared to play a video recording of a law enforcement interview of Collins. The court instructed the jury that, if it found anything that Collins said in the recorded interview to be inconsistent with what he said on the stand, the jury could consider it only for purposes of impeachment.

In the recorded interview, Collins acknowledged that a gun was "out" before one of the men (Hamm or Schnippel) took out his phone and threw it on the ground. Hollins then asked why defendant shot Hamm after Hamm "gave his stuff." Collins answered that defendant "didn't do it while I was there." Collins acknowledged, however, that defendant pulled a gun before Collins left the scene.

After the video recording stopped playing, the prosecutor asked Collins whether he recalled having told the detective "that *** [defendant] did pull out a gun." Collins responded affirmatively. Collins then testified directly about what had happened in the park, acknowledging that defendant had ordered the victims, at gunpoint, to empty their pockets:

"[PROSECUTOR:] I'm asking you, did [defendant] say something. I'm asking what he said now. Did he say something once he pulled out the gun and pointed it at the two of them?

"A   I honestly don't recall.

"Q   But he—you don't recall if he said something?

"A   (No audible response.)

"Q   After he pulled out his gun and he pointed that at them, Mr. Hamm put his phone on the ground, didn't he?

"A   (No audible response.)

"Q   So you have him empty his pockets and put it on the ground, right?

"A   (No audible response.)

"Q   So you have to—you can't just shake your head.

"A   Yeah.

"Q   Is that a yes?

"A   Yeah.

"Q   After the gun was pointed on 'em, right?

"A   Yeah.

"Q   And after the fight was already over, right?

"A   Yeah.

"Q   So what were you doin' at this time?

"A   Standin' around.

"Q   Just standin' around. Mr. Schnippel wasn't attacking you at this time, was he?

"A   Not exactly.

"Q   Mr. Hamm wasn't attacking you at this time, was he?

"A   Not exactly.

"Q   They were puttin' their stuff on the ground because they had a gun pointed at them, isn't that true?

"A   One was already on the ground, like I said.

"Q   Okay. So somebody already had his stuff on the ground; that somebody took their stuff and put it on the ground, right?

"A   (No audible response.)

"* * * * *

"Q   And why did somebody just empty their pockets with the gun pointed at them?

"A   I don't know.

"Q And after [defendant's] standing there with a gun pointed at both of these individuals who have now emptied their property on the ground, what do you do?

"A I just pick it up and ran."

Collins also testified that neither Hamm nor Schnippel followed or attacked him as he ran away. Collins acknowledged that, as far as he knew, defendant was still pointing the gun at them. After that, Collins heard a gunshot; of the three people who were there, defendant was the only person who had a gun.

Hollins also testified, and described—solely for purposes of impeaching Collins's testimony—that Collins had said, during an interview, that he and defendant had gone to the park intending to rob Hamm. He also described other statements that Collins had made in interviews that were relatively consistent with Collins's testimony outlined above. Thus, the only significant point on which Hollins's testimony impeached Collins's related to whether defendant and Collins had gone to the park intending to rob the victims. Collins denied at trial that he and defendant had acted with that intent; the detective testified—for impeachment purposes—that Collins had told him that they did intend to commit the robbery.

As noted, defendant argues on appeal that the trial court erred by permitting the prosecutor to elicit testimony from Collins "about his cooperation agreement with the state." Defendant's argument is based on a single question that the prosecutor asked toward the beginning of the exchanges quoted above: "Isn't it true under the terms of the agreement that you had entered into * * * it calls for your truthful testimony as given to law enforcement?" He asserts that, by using the phrase "truthful testimony as given to law enforcement," the prosecutor "directly expresse[d his] belief that Collins's *prior statements* to law enforcement were truthful," rather than his "inconsistent testimony at trial." (Emphasis in defendant's brief.) Thus, defendant contends that the prosecutor's question, to which Collins responded affirmatively, elicited improper "vouching" testimony.[2]

---

[2] Defendant's argument is narrow. He did not argue below, and does not argue on appeal, that the state was precluded from introducing *any* evidence that

It is settled in Oregon that one witness may not testify about the credibility of another witness. *State v. Sanchez-Jacobo*, 250 Or App 621, 630, 282 P3d 880 (2012), *rev den*, 353 Or 280 (2013). That prohibition does not prevent a witness from testifying that he or she has agreed, in the context of a plea or other cooperation agreement with the state, to testify truthfully. *See id.* at 631 ("A witness's assertion under oath that he or she is being truthful simply is not the type of evidence that a jury might improperly view as a guarantee of the witness's veracity." (internal quotation marks omitted)). However, in keeping with the general prohibition against "vouching," the state may not introduce evidence that a witness's plea agreement includes an expression of belief by the state. That principle is explained in *State v. Charboneau*, 323 Or 38, 913 P2d 308 (1996), a case in which a witness, Smith, entered into a plea agreement that required him to testify truthfully at the defendant's trial; the agreement also stated, "The primary reason for this agreement is that, based on Smith's statements and on its investigation, the State believes this charge accurately reflects the role Smith played in the death of [the victim]." *Id.* at 42-43. The Supreme Court held that that part of the plea agreement amounted to impermissible vouching because it expressed "an opinion as to a trial witness's credibility." *Id.* at 48.

Defendant argues that this case is like *Charboneau* in that the state impermissibly introduced evidence indicating that the state believed a particular version of events described by the witness (here, Collins's statements to

---

Collins had entered into a cooperation agreement. Rather, defendant objected only to the extent that the prosecutor sought to elicit evidence that the agreement required Collins to testify *truthfully*. In that respect, this case resembles *State v. Sanchez-Jacobo*, 250 Or App 621, 282 P3d 880 (2012), *rev den*, 353 Or 280 (2013). In that murder case, a witness to the crime testified pursuant to a plea agreement that required her to testify truthfully. The defendant objected when the witness described her plea agreement, asserting that the witness's testimony constituted improper vouching and bolstering. The trial court overruled the objection, and we affirmed. *Id.* at 627-32. There, too, the defendant had not objected to the jury learning of the existence of the witness's cooperation agreement; rather—as here—the defendant objected only to evidence about terms of the agreement that he believed constituted improper vouching. *Id.* at 631 & n 3. In *Sanchez-Jacobo*, we therefore did not address the broader question of the overall admissibility of cooperation agreements, but confined our analysis to the more limited argument the defendant made on appeal. We take the same approach here.

Hollins). The state contends that *Charboneau* is distinguishable because the record in this case includes "no statement or suggestion that the agreement Collins executed contained any vouching." It concludes that "defendant has failed to demonstrate that the prosecutor's inquiry about the agreement to testify truthfully was improper."

We need not resolve that dispute because, after careful review of the record, we conclude that any error associated with admitting evidence about Collins's cooperation agreement was harmless. "We must affirm a judgment, despite any error committed at trial, if we determine that there is 'little likelihood that the particular error affected the verdict.'" *State v. Abbott*, 274 Or App 778, 789, 362 P3d 1171 (2015), *rev den*, 358 Or 794 (2016) (quoting *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003)). "That 'harmless error' inquiry is informed by a variety of considerations, including 'the nature of the error' and the 'context' of that error." *Id.* (quoting *Davis*, 336 Or at 32-33).

Again, the nature of any error here is the state having expressed belief in the accuracy of the statements that Collins gave to law enforcement, *i.e.*, the statements that he made to Hollins. The context of the claimed error is an assertion that, because the state essentially vouched for the statements that Collins made to law enforcement, the jury would be more likely to believe those statements, as opposed to the testimony that Collins gave at trial.

That argument presumes that Collins's statements to police differed materially from his trial testimony. But they did not. Although Collins was a reluctant witness for the state, he eventually acknowledged in his trial testimony (after having been confronted with his recorded statement) that he and defendant went to the park to buy marijuana from Hamm, that he (Collins) and defendant were both armed with guns, that an altercation ensued during which Hamm hit Collins with a stick, that—after the fight had ended—defendant ordered the victims to empty their pockets at gunpoint, that Collins picked up Hamm's possessions and fled the scene, and that Collins then heard a gunshot. That is essentially the same version of events that Collins had previously given Hollins, with one exception.

The detective testified that Collins had told him that Collins and defendant had gone to the park intending to rob Hamm and Schnippel; at trial, Collins denied that he and defendant had that intent. Thus, if the evidence about Collins's cooperation agreement amounted to the state vouching for the accuracy of the statements that Collins had given to Hollins—as opposed to the statements he made at trial—that vouching could have affected the jury's verdict only if the verdict depended on whether the jury believed that defendant and Collins had gone to the park with the intention of committing a robbery.

In the context of this case, there is no reason to believe that the jury's verdict was influenced by Hollins's testimony that Collins admitted that he and defendant had planned the robbery. Collins acknowledged during his trial testimony that defendant pulled a gun on Hamm and Schnippel *after* the altercation over marijuana had ended. He admitted that defendant ordered the two victims, at gunpoint, to empty their pockets. He admitted that he grabbed Hamm's dropped possessions and fled the scene, while defendant still was pointing his gun at the victims, and he acknowledged that neither Hamm nor Schnippel assaulted or ran after him at that time. It was after that that Collins heard the gun fire, when defendant shot Hamm. Collins's testimony on those points—which was materially consistent with what he had told Hollins—corroborated the victims' basic narratives, establishing the basis for defendant's convictions for assault, robbery, and UUW. Any dispute about whether defendant had planned the robbery ahead of time could not change the basic facts of what happened in the park. The convictions would be the same, whether defendant planned the robbery long in advance or decided to rob the victims only after they argued about the marijuana transaction. Accordingly, even if the state impermissibly vouched for the statements that Collins made to Hollins, any error associated with admitting the vouching evidence was harmless.

B. *Merger*

We turn briefly to defendant's argument that the trial court erred by not merging the guilty verdicts for UUW-firearm and FIP-firearm into a single conviction for

FIP-firearm. Defendant concedes that he did not argue to the trial court that those verdicts should merge, but he argues that the lack of merger amounts to plain error under *State v. Flores*, 259 Or App 141, 313 P3d 378 (2013), *rev den*, 354 Or 735 (2014). According to defendant, the verdicts merge under ORS 161.067(1) because defendant committed the two crimes during a single criminal episode and the crime of UUW-firearm "does not require proof of any element that is not also required by the * * * crime" of FIP-firearm.[3] That plain-error argument fails under *State v. Dentel*, 272 Or App 130, 354 P3d 753 (2015), decided after the parties briefed this case. In that case, we held that, because the state had "presented a plausible argument that UUW-firearm and FIP-firearm, as charged [in *Dentel*], each includes an element that the other does not," it was not beyond dispute that the verdicts for those crimes should merge under ORS 161.067(1). *Id.* at 136. The way in which UUW-firearm and FIP-firearm were charged here does not differ materially from how they were charged in *Dentel*. Accordingly, here— as in that case—the trial court did not plainly err when it did not merge the guilty verdicts for those crimes.

Affirmed.

---

[3] ORS 161.067(1) provides:

"When the same conduct or criminal episode violates two or more statutory provisions and each provision requires proof of an element that the others do not, there are as many separately punishable offenses as there are separate statutory violations."