KISTLER, S. J.
*800 Defendant appeals from a second-degree theft conviction for stealing merchandise from a Walmart store. On appeal, he assigns error to the trial court's ruling preventing him from vouching for his own testimony. The state concedes that the trial court erred in excluding that testimony, and the question on appeal reduces to whether the error was harmless. For the reasons explained below, we conclude that it was. We accordingly affirm the trial court's judgment.
Three witnesses testified at trial: a Walmart employee who reviewed surveillance videos taken while defendant was in the store, a police officer who interviewed defendant after the employee reported the theft to the police, and defendant. We summarize each person's testimony below, as well as the exhibits offered at trial.[1]
Medlinsky works as a loss prevention officer at the Grants Pass Walmart store. While working there, she received a note that "somebody had run out of the building with a full backpack." She reviewed surveillance tapes for the time that the suspect was in the store. Those tapes showed that the suspect entered the store around 8:30 p.m. on May 10 and left hurriedly at approximately 12:30 a.m. on May 11. During those four hours, he walked around the store, selected items from the shelves, and placed some of them in a shopping cart. Among the items were a backpack-which a store employee had removed from a locked rack and left at a register-an air mattress, and a tent. On the tapes, Medlinsky could see the suspect taking the air mattress, backpack, and tent out of the store. She also noticed that the backpack was full as the suspect left and assumed that it contained smaller items that he had put in the shopping cart as he walked around the store. Video from a camera outside the store showed the person running along the side of the store toward a fence.
Medlinsky reviewed the sales records for the time that the suspect was in the store to see if she could find any *801 record of a sale for the three larger items (the air mattress, backpack, and tent) that she could see him take out of the store. However, the sales records did not show that anyone had purchased those items during the time that the suspect was in the store.[2] She put together a *1138 loss prevention report and also some surveillance video and still photos from the video, which she provided to the police.[3] On seeing those materials, Officer Kopp identified defendant as the person pictured in the video and the stills. Kopp also discovered that defendant was in custody and spoke with him at the Josephine County jail on May 29.
In speaking with Kopp, defendant confirmed that he was the person in the video but denied stealing any of the items. He explained to Kopp that he had purchased those items and had receipts for all of them. Kopp told defendant that the video showed him purchasing a couple of items from the electronics department but said that it did not show him purchasing the other items, such as the tent that he took out of the store. When defendant insisted that he had receipts for all the items, Kopp told him, "Well, if you have receipts for them, you're going to want to present them once we go to court, all right?" Defendant noted that he could not get the receipts while he was in custody, and Kopp responded, "Well, hopefully when you get out of here, before your next court appearance (indiscernible), you'll be able to show the receipts."
The final person to testify was defendant. Defendant testified that his boss had dropped him off at the Walmart store after work and that he had been killing time waiting for his ride to come pick him up. He testified that he bought various items from Walmart separately, some at the self-checkout counters and others from cashiers at registers, as he waited for his ride over the four-hour period. He *802 confirmed Medlinsky's conclusion that he had put some of the smaller items that initially were in the shopping cart into the backpack before he left the store. He also agreed that he had rushed out of the store with the air mattress, backpack, and tent. He explained that he had received a text around 12:30 a.m. indicating that his ride was waiting for him outside and that he rushed out of the store so that his ride would not leave him. Defendant also testified that he had kept the sales receipts for the items he took out of the store and that the receipts were in the bags with the items. He testified that the "following day I got arrested [for some other reason] at 5:00 in the morning, and so I hadn't really had a chance to-to unpack that stuff and throw away the receipts. I actually still have them * * *."
Defendant also testified that, as he was "rushing out of the store," he heard "somebody behind [him] saying, 'He's stealing,' but [he] didn't think she was talking [about him]." He explained that he "passed numerous-numerous employees. * * * They didn't bother to stop me, so I honestly didn't think that she was talking to me, you know, or was-or was accusing me of it."
On cross-examination, defendant essentially confirmed his earlier testimony, and he agreed that he had asked Kopp, "Is there any way that I won't be charged with this?" Defendant then began explaining that he had been concerned that the charge might affect an existing "downward dispositional [departure]." Despite the prosecutor's suggestion that defendant's existing downward dispositional departure was "a little bit off topic," defendant continued to explain that his downward dispositional departure had been "the basis for most of [his] decisions * * * since [he] got on probation last March."
On redirect, defense counsel asked defendant if he had been arrested for things in the past and was on probation at that point, to which defendant replied, "Oh, yes."[4]
*1139 *803 Defendant noted that "there was a time where when I was on probation every single time I got ID-ed by an officer." The following exchange then took place:
"[DEFENSE COUNSEL]: As a result of that, an implication can be made by the State that you would therefore lie. Is that the case here?
"[STATE]: Objection, Your Honor. He can't comment on his own-
"[DEFENDANT]: Thank you.
"[STATE]: -truthfulness.
"[DEFENDANT]: Thank you. I wasn't quite sure -
"THE COURT: Sustained.
"[DEFENDANT]: Okay. I wasn't-
"THE COURT: Why don't you just wait for the next question?
"[DEFENDANT]: Okay.
"[DEFENSE COUNSEL]: I have nothing further."
Given that evidence, the trial court found defendant guilty of second-degree theft.
As noted, on appeal, defendant has assigned error to the trial court's ruling preventing him from responding to his counsel's observation that, because his probation could be revoked, "an implication can be made by the State that [defendant] would therefore lie." The state, for its part, concedes that, in light of our decision in State v. Sanchez-Jacobo , 250 Or. App. 621, 631-32, 282 P.3d 880 (2012), rev. den. , 353 Or. 280, 298 P.3d 30 (2013), the trial court erred. That is, the state does not dispute that the prohibition against vouching does not extend to a witness's commenting on his or her own credibility. We accept the state's concession and turn to the only question remaining on appeal-whether, in the context of this case, the ruling was harmless. More specifically, the question is whether any error in foreclosing defendant from vouching for his own credibility was harmless because, in the context of this case, it had little likelihood of affecting the trial court's verdict. See State v. Davis , 336 Or. 19, 32, 77 P.3d 1111 (2003).
*804 In considering that issue, we note, as an initial matter, that defendant did not make an offer of proof when the trial court sustained the state's objection. Because the substance of what defendant would have said can be inferred from his counsel's question, no express offer of proof was necessary to preserve the error for appeal. See State v. Wirfs , 250 Or. App. 269, 274, 281 P.3d 616, rev. den. , 352 Or. 378, 290 P.3d 814 (2012). However, one function of an offer of proof is to permit an appellate court to determine whether erroneously excluded evidence was likely to have affected the verdict. See State v. Affeld , 307 Or. 125, 128, 764 P.2d 220 (1988). Without some explanation at trial as to what defendant would have said if he had been permitted to answer the question, defendant is left to argue on appeal that the implication in his counsel's question-he would have asserted that he was not lying-was harmful.[5]
On appeal, defendant argues that, because his credibility was the central issue at trial, preventing him from asserting, "I'm not lying," at the end of his testimony likely affected the verdict. The state counters that the excluded testimony was of minimal significance because an assertion that defendant was not lying did not add anything of significance to his oath to tell the truth, especially in light of the trial court's ability to make an independent assessment of defendant's credibility when he testified at trial. The specific issue here, then, is whether there was little likelihood that if defendant had been permitted to affirm the veracity of his story, the court would have been more likely to believe his testimony, as opposed to the testimony and evidence provided by the state.
Evidentiary error is not presumed to be prejudicial, OEC 103(1), and we will affirm despite an evidentiary error if there is "little likelihood that the particular error affected the verdict." Davis , 336 Or. at 32, 77 P.3d 1111. That " 'harmless error' inquiry is informed by a variety of considerations, including 'the nature of the error' and the 'context' of the error." State v. Abbott , 274 Or. App. 778, 789, 362 P.3d 1171 (2015), rev. den. , 358 Or. 794, 370 P.3d 502 (2016) (quoting Davis , 336 Or. at 32-33, 77 P.3d 1111 ).
*1140 Both *805 those considerations lead us to conclude that, in the circumstances of this case, the error was harmless.
We consider first the nature of the error that occurred below. State v. Maiden , 222 Or. App. 9, 13, 191 P.3d 803 (2008), rev. den. , 345 Or. 618, 201 P.3d 909 (2009). That consideration involves the assessment of any differences between the quality of the evidentiary error and other evidence admitted on the same issue. Id. ; see Davis , 336 Or. at 33-34, 77 P.3d 1111 (focusing on whether the finder of fact would have regarded the evidence as duplicative, cumulative, or unhelpful in its deliberations). Here, although it is conceded that the trial court erred in not allowing defendant to testify about his own credibility, the content of the excluded statement does not differ meaningfully from the assertion implied by the oath that defendant took before testifying.
As required by OEC 603(1),[6] defendant swore that he would "testify truthfully" when he took the witness stand. To be sure, the oath that defendant swore when he took the stand and the assertion that he would have made at the end of his testimony are not identical. See State v. Evans , 98 Or. 214, 225, 192 P. 1062 (1920) ("[C]umulative evidence is additional evidence of the same character to the same point ." (Internal quotation marks omitted; emphases added.)). The oath is a promise, made under penalty of perjury, that a witness "will testify truthfully." OEC 603 (emphasis added).
*806 It follows that every statement a witness makes under oath carries with it an implied assertion that the statement is truthful. The excluded testimony that defendant would have offered was that he had not lied during his testimony. Although the two statements are not precisely the same, any difference is marginal. The statement that defendant would have offered at the end of his testimony (I have not lied) would not have added any appreciable information to his earlier sworn promise that every statement he was going to make would be true.
To be sure, if defendant had made a specific offer of proof when the trial court sustained the state's objection, then we would be able to test whether a more complete explanation would have made a difference. Without a specific offer of proof, however, defendant is left with a pale denial that he was not lying, which does not differ in any meaningful way from the promise to testify truthfully that he made when he took the oath.
Moreover, to the extent that defendant sought to testify that he was not lying because his probation might be revoked, we note that the state never raised defendant's probationary status when it questioned him. Rather, defendant interjected that issue in response to an unrelated question. When he did so, the state sought to change the subject, noting that "that's a little bit off topic." Consistently, the state neither mentioned nor alluded to defendant's probationary status or to any possible effect that his status might have on his credibility either in questioning defendant or in its closing argument or rebuttal. Cf. State v. Henley , 363 Or. 284, 308-09, 422 P.3d 217 (2018) (focusing on, among other things, on the prosecutor's use of improperly admitted testimony during closing to conclude that the evidence likely affected *1141 the verdict). Rather, the state focused on the evidence from the surveillance videos, Medlinsky's testimony that the store had no record of any sale of the items (the air mattress, backpack, and tent) that the videos showed defendant taking out of the store, and the absence of any sales receipts that defendant testified he still possessed.
We also consider the context in which the error occurred.
*807 State v. James , 279 Or. App. 612, 631, 379 P.3d 626 (2016), rev. den. , 361 Or. 486, 395 P.3d 872 (2017). In this case, video evidence showed, and defendant admitted, that he left the store hurriedly with a backpack full of items from the Walmart shelves, an air mattress, and a tent. The video does not show him paying for all the items and, more importantly, Medlinsky testified that there was no record that anyone had paid for an air mattress, a backpack, or a tent during the time that defendant was in the store. On this record, we conclude that there is little likelihood that the trial court's assessment of defendant's credibility would have changed with the admission of the excluded testimony. We accordingly conclude that the error was harmless and affirm the trial court's judgment.
Affirmed.

The question whether a ruling was harmless requires us to review all the pertinent portions of the record, State v. Sierra-Depina , 230 Or. App. 86, 88, 213 P.3d 863, rev. den. , 347 Or. 290, 219 P.3d 592 (2009), and we set out the facts consistently with that standard.

Medlinsky reviewed the sales records for the two days that the suspect was in the store, May 10 and 11. The only record of a sale for any of the items that she could find was an air mattress sold at 4:57 p.m. on May 11, more than 16 hours after the suspect had left the store. Medlinsky estimated the items stolen and prepared a mock receipt for those items, which stated $ 152.14 as the approximate value of the merchandise.

The video, which was received as an exhibit at trial, does not cover the entire period of defendant's four-hour visit. It only includes those parts that Medlinsky concluded were pertinent.

At that point in the trial, the prosecutor had asked defendant on cross-examination to identify Exhibit 5, which defendant described as a judgment. The prosecutor, however, did not question defendant further about Exhibit 5, nor did she offer it into evidence until after defendant had finished testifying. After defendant had finished testifying, the prosecutor offered and the trial court admitted Exhibits 5 through 13, which reflect defendant's prior convictions.

In his brief, defendant characterizes that he would have testified precisely that way.

OEC 603 provides:
"(1) Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the conscience of the witness and impress the mind of the witness with the duty to do so.
"(2) An oath may be administered as follows: The person who swears holds up one hand while the person administering the oath asks: 'Under penalty of perjury, do you solemnly swear that the evidence you shall give in the issue (or matter) now pending between _______ and _______ shall be the truth, the whole truth and nothing but the truth, so help you God?' If the oath is administered to any other than a witness, the same form and manner may be used. The person swearing must answer in an affirmative manner.
"(3) An affirmation may be administered as follows: The person who affirms holds up one hand while the person administering the affirmation asks: 'Under penalty of perjury, do you promise that the evidence you shall give in the issue (or matter) now pending between _______ and _______ shall be the truth, the whole truth and nothing but the truth?' If the affirmation is administered to any other than a witness, the same form and manner may be used. The person affirming must answer in an affirmative manner."